Pauline KIRK, Plaintiff–Appellant,

v.

MERCY HOSPITAL TRI–COUNTY,
Defendant–Respondent.

No. 17983.

Missouri Court of Appeals,
Southern District,
Division Two.

March 1, 1993.

Motion for Rehearing or Transfer to
Supreme Court Denied
March 24, 1993.

James R. Cox, Springfield, for plaintiff-appellant.

Frank M. Evans, Maureen M. Jersak, Miller & Sanford, P.C., Springfield, for defendant-respondent.

MONTGOMERY, Presiding Judge.

Pauline Kirk (hereinafter Plaintiff) appeals from the circuit court's judgment which sustained a Motion for Summary Judgment filed by Defendant Mercy Hospital Tri–County (hereinafter Hospital).[1] Seeking reversal, Plaintiff's single point

---

1. The summary judgment related to Count IV of Plaintiff's Amended Petition which in general alleged a claim for wrongful discharge under Missouri's public policy exception to the employment-at-will doctrine. Pursuant to Rule 74.-01(b) the trial court made an express determination there is no just reason for delay and denoted as "appealable" its judgment.

contends the trial court erroneously interpreted (a) the law in concluding "Missouri's public doctrine is too narrowly defined to allow a true public policy exception to the employment-at-will doctrine," and (b) the law and facts in concluding there is "no clear mandate in law or regulation prohibiting the actions of the [Hospital] of which the [Plaintiff] complained; namely, [her] discharge as a nurse." We agree with Plaintiff and for reasons which follow reverse and remand.

Plaintiff, a registered nurse, started working on a part-time basis for the Hospital on December 24, 1982. On July 12, 1983, Plaintiff was employed full time as a charge nurse with the duty to supervise other nurses and assistants on the ward during her shift. In this capacity, she reported directly to Norma Sellers, the Hospital's Director of Nursing.

Shortly before Plaintiff's termination, Debbie Crain was admitted to the Hospital as one of Plaintiff's patients. Soon after Debbie Crain's admission Plaintiff, as required, made a nursing assessment and nursing diagnosis of that patient's condition. Her nursing diagnosis was toxic shock syndrome, a condition that results in death, if untreated. Plaintiff anticipated immediate doctor's orders for antibiotics to combat the life-threatening infection. Time passed with no such orders, and Plaintiff repeatedly discussed the situation with Norma Sellers. After showing extreme concern, Plaintiff was instructed by Sellers to "document, report the facts and stay out of it." The treating doctor never gave the orders Plaintiff expected for the proper care of Debbie Crain. When protocol allowed, Plaintiff discussed Debbie Crain's condition with Dr. Jumper, the Chief of Medical Staff. Appropriate steps were then taken, but to no avail. Debbie Crain later died from the effects of massive internal infection.

Within a day or two prior to Plaintiff's termination on March 22, 1984, Norma Sellers was visited by a member of Debbie Crain's family who informed her that Plaintiff had offered to obtain Debbie Crain's medical records for the family. On the day of Plaintiff's termination, a Hospital employee reported to Sellers that Plaintiff had stated Debbie Crain's physician was "paving her way to heaven." Sellers advised Mr. Lorimer, the Hospital Administrator, of Plaintiff's statement. He directed Sellers to terminate Plaintiff that day, which she did.

Plaintiff received a letter from the Hospital's attorney soon after her discharge which admonished her to "immediately cease making any further false statement regarding [the Hospital]." Plaintiff then requested a service letter, and the Hospital made the following response:

> The reason and cause for your dismissal is that it came to the attention of the hospital administration that on several occasions you made certain statements concerning the hospital, its staff or employees which were untrue and detrimental to the hospital. These statements exhibited a lack of support for the hospital administration and medical staff.

Based on these facts, the trial court entered summary judgment in favor of the Hospital, finding that "Missouri's public doctrine is one too narrowly defined to allow a true public policy 'exception.' ... Specifically, the Court can find no clear mandate in law or regulation prohibiting the actions of the [Hospital] of which the Plaintiff complains; namely, her discharge as a nurse."

In reviewing a summary judgment, the appellate court must scrutinize the record in the light most favorable to the party against whom the summary judgment was entered and accord that party the benefit of every doubt. *Germania Bank v. Thomas*, 810 S.W.2d 102, 105 (Mo. App.1991). Summary judgment is a drastic remedy and is inappropriate unless the prevailing party has shown that he is entitled to judgment as a matter of law. *Maryland Cas. Co. v. Martinez*, 812 S.W.2d 876, 879 (Mo.App.1991). The trial court may enter a summary judgment where the pleadings, depositions and admissions on file, together with the affidavits, if any, show that no genuine issue of material fact exists and that the law entitles the moving

party to a favorable judgment. *Jennings v. City of Kansas City*, 812 S.W.2d 724, 728 (Mo.App.1991); Rule 74.04(c).

As we view the summary judgment entered, the trial court found as a matter of law (1) there is no public policy exception to the employment-at-will doctrine in Missouri, and (2) there is no clear mandate in law or regulation to prohibit the Hospital from discharging Plaintiff. The summary judgment was entered after the court made these two pronouncements of law, and the only issue raised by Plaintiff relates to these conclusions.

▪ The trial court erroneously determined there is no public policy exception to the employment-at-will doctrine in this state. Apparently, the Hospital successfully convinced the lower court that *Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661 (Mo. banc 1988), reached such result. *Johnson* does not so hold even though the Supreme Court said, "The Court does not deem it necessary to engraft a so-called 'public policy' exception onto the employment at will doctrine." *Id.* at 663. The Court then noted three cases cited by plaintiff which enunciate the public policy exception to the employment-at-will doctrine. In each case, the employee had the benefit of a constitutional provision, a statute, or a regulation based on a statute. The Court concluded by saying, "No statute, regulation based on a statute, or constitutional provision is implicated here." *Id.* Thus, *Johnson* was not a "public policy exception" case and the cited cases enunciating such rule were not overruled. The actual issue in *Johnson* centered on whether there was a "handbook exception" to the employment-at-will doctrine in Missouri.

One of the plaintiff's three citations in *Johnson* is *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859 (Mo.App.1985), which contains a thorough and scholarly discussion on the subject at hand. The analysis of the public policy exception in *Boyle* begins with a statement of the employment-at-will doctrine.[2] "That doctrine simply provides that an employer can discharge for cause or without cause an at-will employee who does not otherwise fall within the protective reach of a contrary statutory provision." *Id.* at 870–71 (footnote omitted), *citing Dake v. Tuell*, 687 S.W.2d 191, 193 (Mo. banc 1985). Continuing, the Court said:

> The public policy exception is a narrow exception to the at-will employment doctrine. It provides that an at-will employee who has been discharged by an employer in violation of a clear mandate of public policy has a cause of action against the employer for wrongful discharge.

*Id.* at 871. The *Boyle* court then proceeded to review numerous public policy exception cases from other jurisdictions and the application of that exception in a multitude of factual situations. The Court concluded by holding:

> Accordingly, where an employer has discharged an at-will employee because that employee refused to violate the law or any well established and clear mandate of public policy as expressed in the constitution, statutes and regulations promulgated pursuant to statute, or because the employee reported to his superiors or to public authorities serious misconduct that constitutes violations of the law and of such well established and clearly mandated public policy, the employee has a cause of action in tort for damages for wrongful discharge.

*Id.* at 878.

Subsequent to *Johnson*, numerous decisions from the Eastern and Western Districts of this Court have consistently relied on the vitality of the public policy exception discussed in *Boyle*. *See Luethans v. Washington Univ.*, 838 S.W.2d 117, 119 (Mo.App.1992); *Petersimes v. Crane Co.*, 835 S.W.2d 514, 517 (Mo.App.1992); *Rothweil v. Wetterau, Inc.*, 820 S.W.2d 557, 559 (Mo.App.1991); *Crockett v. Mid–America Health Serv.*, 780 S.W.2d 656, 658 (Mo.App. 1989); *Loomstein v. Medicare Pharmacies, Inc.*, 750 S.W.2d 106, 112 (Mo.App. 1988).

---

2. "Employees who do not have a contract for a definite period of time are considered 'employ-ees-at-will.'" *McCloskey v. Eagleton*, 789 S.W.2d 518, 519 (Mo.App.1990).

We hold that the public policy exception to the employment-at-will doctrine is alive and well. The trial court erroneously concluded otherwise.

Turning to the remaining prong of Plaintiff's point, we believe the trial court committed error by finding there is no clear mandate in "law or regulation" to prohibit the Hospital from discharging Plaintiff. A clear example of the trial court's error is found in *Gannon v. Sherwood Medical Co.*, 749 F.Supp. 979 (E.D.Mo.1990), which construes Missouri law on this issue. There, plaintiff brought an action alleging in Counts I and III of her complaint that defendant discharged her solely on account of her age, in violation of the Age Discrimination in Employment Act, or solely in retaliation for the filing of a workers' compensation claim, in violation of § 287.780.[3] As an alternative basis of recovery, plaintiff pled in Count IV that defendant violated the public policy of the State of Missouri by discharging her on account of her age and in retaliation for the filing of a workers' compensation claim. In sustaining a motion to dismiss Count IV, the Court said:

> Under Missouri law an employee may not maintain an action for wrongful discharge in violation of public policy unless the employee can demonstrate the existence of a statute, regulation or constitutional provision which clearly mandates the implication of such a policy. *See Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 663 (Mo.1988) *en banc* . . . .
>
> There is no need for the Court to imply a cause of action based upon the policies mandated by the ADEA and the Workers' Compensation Act because those statutes contain remedial provisions which provide for direct recovery thereunder. In the public policy cases cited by plaintiff, the provisions upon which the employees relied to demonstrate the

existence of a particular public policy did not provide for direct recovery.

*Id.* at 981.

The rule followed in *Gannon* was clearly stated in *Prewitt v. Factory Motor Parts, Inc.*, 747 F.Supp. 560 (W.D.Mo.1990), where plaintiff asserted a claim for wrongful discharge under the public policy exception to Missouri's employment-at-will doctrine. The Court relied on *Wehr v. Burroughs Corp.*, 438 F.Supp. 1052, 1055 (E.D.Pa. 1977), where that Court said:

> It is clear then that the whole rationale undergirding the public policy exception is the vindication or the protection of certain strong policies of the community. If these policies or goals are preserved by other remedies, then the public policy is sufficiently served. Therefore, application of the public policy exception requires two factors: (1) that the discharge violate some well-established public policy; and (2) that there be no remedy to protect the interests of the aggrieved employee or society.

*Id.* at 565–66. The public policy which plaintiff relied upon was a section of the Fair Labor Standards Act which also provided plaintiff with a statutory remedy for the alleged violation. Thus, the public policy exception to the employment-at-will doctrine was inapplicable.

▮▮▮▮ Here, the trial court apparently concluded Plaintiff, as an at-will employee, could be lawfully discharged unless a specific "law or regulation" prohibited the Hospital from doing so. Both *Gannon* and *Prewitt* demonstrate that if such law or regulation existed, Plaintiff's remedy would flow from any such alleged violation. A finding that no such law or regulation existed does not preclude Plaintiff from asserting her claim for wrongful discharge based on the public policy exception to the employment-at-will doctrine.

The gist of Plaintiff's claim here is that her discharge violated a clear mandate of public policy as reflected in The Nursing Practice Act (NPA), §§ 335.011 to 335.096.[4]

---

**3.** Statutory references are to RSMo 1986 unless otherwise indicated.

**4.** Plaintiff also contends the licensing statutes relating to hospitals, § 197.040 et seq., apply to

show a clear mandate of public policy relating to her discharge. We choose to reach our decision on a more narrow basis, i.e., the application of the NPA to Plaintiff's claim.

She makes no claim of any specific statute, regulation or constitutional provision that prohibited the actions taken by the Hospital. She is entitled to pursue her claim without reliance on any direct violation of "law or regulation" by the Hospital. In this regard, the trial court's determination was erroneous as a matter of law.

The Hospital argues the NPA on which Plaintiff relies "does not constitute a clear mandate of law on which a cause of action for wrongful discharge in violation of public policy may be based." In essence, the Hospital believes the trial court reached the right result for the wrong reason. Our review of a grant of summary judgment is equivalent to review of a court-tried case and if, as a matter of law, the judgment is sustainable on any theory, it must be affirmed. *Nigro v. Ashley*, 690 S.W.2d 410, 416 (Mo.App.1984). On this issue we must decide if there is a clear mandate of public policy reflected by the NPA with application to the facts in this case.

"Public policy" as described in *Boyle* is "that principle of law which holds that no one can lawfully do that which tends to be injurious to the public or against the public good. It finds its sources in the state constitution, in the letter and purpose of a constitutional, statutory or regulatory provision or scheme, in the judicial decisions of the state and national courts, in 'the constant practice of the government officials,' and, in certain instances, in professional codes of ethics." 700 S.W.2d at 871 (citations omitted).

Plaintiff, as a registered nurse, was licensed under the provisions of the NPA. Section 335.016(8) of the Act defines the profession in this manner:

"**Professional nursing**" is the performance for compensation of any act which requires substantial specialized education, judgment and skill based on knowledge and application of principles derived from the biological, physical, social and nursing sciences, including, but not limited to:

(a) Responsibility for the teaching of health care and the prevention of illness to the patient and his family; or

(b) Assessment, nursing diagnosis, nursing care, and counsel of persons who are ill, injured or experiencing alterations in normal health processes; or

(c) The administration of medications and treatments as prescribed by a person licensed in this state to prescribe such medications and treatments; or

(d) The coordination and assistance in the delivery of a plan of health care with all members of the health team; or

(e) The teaching and supervision of other persons in the performance of any of the foregoing.

Section 335.021 creates "The Missouri State Board of Nursing," and § 335.036 gives the Board authority to adopt rules and regulations to carry into effect the provisions of the NPA. That statute also requires the Board to set minimum standards for educational programs preparing persons for licensure under the Act and to license qualified applicants. Further, the Board shall "[c]ause the prosecution of all persons violating provisions of [the NPA]...." § 335.036.1(8). After a hearing, the Board is empowered to revoke or suspend the license of a registered nurse for causes listed under § 335.066.2. Among those grounds are:

. . . .

(5) Incompetency, misconduct, gross negligence, fraud, misrepresentation or dishonesty in the performance of the functions or duties of any profession licensed or regulated by this chapter;

(6) Violation of, or assisting or enabling any person to violate, any provision of this chapter, or of any lawful rule or regulation adopted pursuant to this chapter;

. . . .

(12) Violation of any professional trust or confidence.

Regulation of the registered nurse profession is extensive as shown by the regulations adopted by the State Board of Nursing in 4 CSR 200–2. That chapter sets minimum standards for accredited programs of professional nursing and registra-

tion of professional nurses.[5] Noteworthy is 4 CSR 200–2.010(1)(A).1 which indicates the purpose of accreditation is to "[t]o promote the safe practice of professional nursing...." Other regulations promulgated by the Board include a procedure for handling public complaints concerning violations of Chapter 335, RSMo by a registered nurse. 4 CSR 200–4.030. Subsection (8) of that regulation indicates the Board interprets this rule "to exist for the benefit of those members of the public who submit complaints to the board...."

Public policy finds its sources "in the letter and purpose of a constitutional, statutory or regulatory provision or scheme...." *Boyle*, 700 S.W.2d at 871. In this case, the public policy alleged to have been violated is set forth in the above NPA and regulations thereunder. That Act and the regulations reveal a clear mandate of public policy. The purpose is to train and license a person to engage in the safe and competent practice of nursing. By definition, a professional registered nurse applies her specialized skills to (1) the prevention of illness to her patient, (2) care and counsel of ill persons, (3) administration of prescribed treatment and medication, and (4) assisting in the delivery of a health care plan. § 335.016(8). Such duties reflect the public policy of this state that registered nurses licensed in this state have an obligation to faithfully serve the best interests of their patients.

Plaintiff could clearly risk discipline and prosecution by the State Board of Nursing if she ignored improper treatment of a patient under her care. Inaction in that situation could be viewed as incompetence, gross negligence or misconduct on the part of Plaintiff. It could be viewed as assisting or enabling another person to commit those acts, or a violation of Plaintiff's professional trust. § 335.066.2(5), (6) and (12). Registered nurses who do not engage in the safe and competent practice of nursing are disciplined under a regulation that exists for the benefit of the public who might suffer from the consequences of unsafe or incompetent nursing care. 4 CSR 200–4.030(8).

Here, Plaintiff perceived Debbie Crain was dying from improper medical treatment. After reporting her views to her direct superior, she was told to "stay out of it." We are convinced the NPA and regulations thereunder sets forth a clear mandate of public policy that Plaintiff not "stay out" of a dying patient's improper treatment. Plaintiff's constant and immediate involvement in seeking proper treatment for Debbie Crain was her absolute duty. Common sense dictates this is the highest duty in the nursing profession.

The Hospital argues the public policy we have discussed is vague and ambiguous. Plaintiff cites numerous cases, including *Boyle*, which contain specific provisions of statutes, regulations or constitutional provisions upon which the plaintiff relied. For example, Plaintiff points to the specific regulation in *Boyle* that requires a process of manufacturing eyeglasses designed to give eyeglass wearers maximum protection against eye injuries and blindness. Contrasting that regulation against the NPA and regulations thereunder, the Hospital believes the vagueness is obvious. We disagree. The definition of "public policy" as defined in *Boyle, supra*, is in itself vague until applied to the facts of each case. Here, that principle would hold that the Hospital cannot lawfully require that Plaintiff "stay out" of Debbie Crain's case because of the obvious injurious consequences. Therefore, on the facts of this case we hold that the NPA and regulations thereunder constitutes a clear mandate of law on which a cause of action for wrongful discharge in violation of public policy can be based.

█ We have not decided that Plaintiff's discharge resulted from her refusal to "stay out of it." On the contrary, our view of the record indicates a material issue of fact exists on the cause of Plaintiff's discharge. The Hospital's service letter indi-

---

**5.** A registered professional nurse or registered nurse is one licensed under the provisions of the NPA. § 335.016(9). *See* § 335.076.

cates a basis for discharge other than the reason Plaintiff argues here. We reverse the grant of the summary judgment and remand for a trial at which the Plaintiff may be afforded an opportunity to establish her allegations that her discharge resulted from her performance of a mandated lawful act contrary to the directions of her employer.

Reversed and remanded.

FLANIGAN and PREWITT, JJ., concur.