John E. AIKEN, Plaintiff,

v.

The BUSINESS AND INDUSTRY HEALTH GROUP, INC. (now known as Employer Health Services, Inc., a Missouri corporation), Defendant.

No. 94–2199–JWL.

United States District Court, D. Kansas.

May 18, 1995.

Roger D. Stanton, Daniel D. Crabtree, Stinson, Mag & Fizzell, Overland Park, KS, for plaintiff.

Nancy M. Landis, Michaela M. Warden, Spencer, Fane, Britt & Browne, Overland Park, KS, for defendant.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

## I. INTRODUCTION

This action arises out of plaintiff's discharge from his employment with the Business and Industry Health Group (BIHG), an operating division of defendant Employer Health Services, Inc. The plaintiff, John E. Aiken, M.D., contends that the defendant wrongfully discharged him in violation of public policy and, in addition, that his termination amounted to a breach of a covenant of good faith and fair dealing implied in the parties' employment contract. This matter is currently before the court on defendant's motion for summary judgment and on plaintiff's motion for an order permitting the jury to determine the amount of punitive damages. For the reasons set forth fully below, defendant's motion for summary judgment is granted and plaintiff's motion for an order permitting the jury to determine the amount of punitive damages is denied as moot.

## II. FACTS

The following facts are uncontroverted or are facts considered in the light most favorable to the plaintiff for purposes of this motion. Plaintiff, a medical doctor, was employed by BIHG from September 15, 1985 through January 31, 1994 as an occupational medicine physician.[1] Plaintiff worked at a number of defendant's clinics in Kansas until

1. Paragraphs 12 and 13 of the "Employment Agreement" between the parties deal with the term of the contract, its renewal and termination. They are set out in full hereafter:

12. This agreement shall be deemed effective and in full force September 15, 1985 through September 14, 1988. This Agreement will automatically renew on the anniversary date unless, at least ninety (90) days prior to such date, either party gives to the other written notice of the intention not to renew. Any alteration, modification or changes in the provisions of this Agreement shall be reduced to writing and executed by the parties. This Agreement may be terminated by either party upon ninety (90) days written notice.

13. Notwithstanding the notice provision in paragraph 12, this Agreement will automatical-

ly terminate without notice prior to the expiration of such term, and employer will be relieved of further obligation hereunder in the event of any of the following:

a. The retirement, death, or permanent disability of physician;

b. Physician's failure to maintain the appropriate license to practice occupational medicine;

c. Physician's failure continuing for thirty (30) days following written notice from employer to perform his duties and other contractual obligations hereunder;

d. Physician's dishonesty, or drug or alcohol addiction; or

e. Inability to obtain malpractice insurance for the physician.

July of 1993 when he was placed on "float status" and was required to rotate through BIHG's clinics in both Kansas and Missouri.

Eugene Welter, M.D., was BIHG's Vice President of Medical Affairs from 1983 through his retirement on August 31, 1994. During his tenure, Dr. Welter was ultimately responsible for the standard of medical care practiced at BIHG's clinics, including procurement of competent physicians, their periodic review, and ultimately a recommendation for termination to the president of BIHG, if their performance was unacceptable to him. Dr. Welter had final responsibility for and review of all medical decisions pertaining to patient care.

From 1991 through his termination, Dr. Welter gave plaintiff several written memoranda regarding his performance. During the twelve-month period prior to his termination, BIHG received more than eight separate complaints regarding plaintiff.

In July of 1993, Peggy Walker, President of BIHG, and Dr. Welter sent plaintiff a memo which stated the following:

As you are aware, we have had several discussions with you regarding company complaints due to loss time.

This memo is to notify you of a move from your permanent position at the Indian Springs clinic to a float physician status. This move is being done in response to numerous company complaints which we have discussed with you regarding excessive time off. In a recent time off report you had 313 lost time days. This is far in excess of any of our system physicians. In addition, as we have begun to discuss the move to Kansas Avenue with our key Fairfax employers many are insistent that you not be involved with their employees. Given the importance, company wide, of the new Kansas Avenue facility meeting aggressive goals, we feel we cannot jeopardize the account base. We feel the best option at this time is to move you into a float physician status.

Dr. Aiken, we urge you to review your current practices in regard to time off. As you have been counseled on numerous occasions, our clients expect quality medical

service but also an understanding of their work site and ability to accommodate light duty and restrictions you may medically place on an individual.

We will continue to monitor your cases. If continued complaints are received we will have no alternative but to exercise the termination notice in your contract. We are confident you will be able to make this adjustment and offer any assistance in helping you determine the needs of our client companies.

On August 26, 1993, Dr. Welter reviewed a chart of a patient seen by plaintiff the day before. The patient did not have a new injury, but was complaining about an injury which had occurred a year earlier. Since the patient had been injured, she had been seen by a number of specialists whose reports were contained in BIHG's file. Those physicians had returned her to work with certain restrictions sometime prior to her visit with plaintiff. Plaintiff, however, had written a permanent restriction, even though this patient had no new injury. Dr. Welter instructed plaintiff to delete the permanent restriction and the medication he prescribed and counseled plaintiff about perceived problems with the approach plaintiff had taken with this particular patient. Plaintiff claims his differences with Dr. Welter over this patient were of medical judgment: he believed the patient was more disabled than Dr. Welter did.

Shortly thereafter, Dr. Welter verbally warned plaintiff that he would be terminated if BIHG continued to receive complaints regarding his performance.

On October 20, 1993, Dr. Welter talked to plaintiff about a complaint that he had received that plaintiff and another physician had left one of defendant's clinics while a patient was waiting to be seen. Plaintiff informed Dr. Welter that he believed that since he was on "float" status, it was the permanent physician's responsibility to stay and care for the patient.

On November 2, 1993, BIHG invoked the ninety-day notice provision in plaintiff's Em-

ployment Agreement.[2] Dr. Welter informed plaintiff that BIHG was terminating his employment effective January 31, 1994.

Plaintiff testified that he was criticized by BIHG because he refused to violate statutes, regulations and ethical rules having to do with "undue influence" on his judgment. It is his belief that defendant was forcing him to violate state statutes and regulations which indicate that a physician should be able to practice without undue influence on his or her judgment. He also stated that he felt he was being forced to violate that part of the Hippocratic Oath which states that a physician "shall fulfill this Oath to the best of [his or her] ability and judgment." He testified that he was not given specific criticisms in this regard, but that he was told he "put too many people off work."

Plaintiff admits that he and Dr. Welter had a disagreement, a difference of medical opinion or judgment, regarding eight of twelve school bus drivers that plaintiff had kept off work. The two physicians had discussions about the school bus drivers more than one time. Plaintiff explained to Dr. Welter that he had put these patients off work for good reason, that they were hurt, they were in pain, they were driving a public conveyance and they had a responsibility of the conveyance and all the school children on the bus. Despite the fact that Dr. Welter expressed disagreement with plaintiff, plaintiff did not alter his treatment or diagnoses of these patients.

Other than the above-mentioned discussion, plaintiff did not directly contact Dr. Welter and stand up for or further explain his belief that defendant was exerting undue influence upon him. He stated that he knew if he disagreed with Dr. Welter, there was no recourse, and that Dr. Welter would not change his mind. Plaintiff testified as follows:

> I asked him what I could do, you know, for future reference in cases where I was considering putting people off work and he said, "Why John, simply mark up the ability slip with a lot of limitations on it." And

he said, "No company will put anybody back to work with all those limitations because they don't have a job for them so they'll let them go home." Well it didn't work that way with some companies.

When asked whether Dr. Welter directed him not to keep people off work, plaintiff stated, "In so many words."

Plaintiff never followed any directions from Dr. Welter or anyone else at BIHG that differed from what he personally believed.

## III. SUMMARY JUDGMENT STANDARD

When considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party. *Langley v. Adams County, Colorado,* 987 F.2d 1473, 1476 (10th Cir.1993). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anthony v. United States,* 987 F.2d 670, 672 (10th Cir.1993). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250; *Tersiner v. Union Pacific R.R.,* 740 F.Supp. 1519, 1522–23 (D.Kan.1990). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inex-

---

**2.** See the last sentence of paragraph 12 of the Employment Agreement set out in footnote 1, above.

pensive determination of every action.' Fed. R.Civ.P. 1." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555.

## IV. DISCUSSION

Plaintiff asserts two claims. First, that defendant terminated him because he refused to violate a clear mandate of public policy as recognized by law and professional ethical codes. He contends that defendant discharged him because he refused to place his employer's economic interests above his legal and ethical duties to his patients and that defendant's economic interests would have required him to put the interests of defendant and its client companies above those of his patients. Second, he claims that his termination amounted to a breach of a covenant of good faith and fair dealing implied in the parties' employment agreement.

Plaintiff argues that both claims are governed by Missouri law and that Missouri would recognize a claim for wrongful discharge as well as a breach of an implied duty of good faith and fair dealing under the circumstances of this case. Defendant, on the other hand, contends that Kansas law applies to plaintiff's wrongful discharge claim and, not surprisingly, that Kansas would not recognize such a claim under the facts presented here. In the alternative, defendant contends that even if Missouri law is applied, plaintiff cannot recover for wrongful discharge. Finally, defendant contends that Oklahoma law applies to bar plaintiff's breach of contract claim or, in the alternative, that Missouri would not recognize such a cause of action here.

■ As is explained below, the court need not decide whether Kansas or Missouri law applies to plaintiff's wrongful discharge claim because it finds, under either state's law, that

plaintiff cannot recover on his claim. The court finds that neither Kansas nor Missouri would recognize a public policy exception to the employment-at-will doctrine [3] under the facts of this case. Nor must the court determine whether Oklahoma or Missouri law applies to plaintiff's breach of contract claim. Oklahoma does not recognize a claim for breach of an implied duty of good faith and fair dealing in an employment-at-will context. Moreover, even if Missouri law were applied, the court does not believe that a breach of the covenant of good faith and fair dealing would be found by the Missouri courts under the circumstances of this case.

### A.  Retaliatory Discharge Claim

#### 1.  Missouri Law

■ Under Missouri law, absent an agreement to the contrary, employees are considered at-will employees and may be dismissed at any time, with or without good cause. *Clark v. Beverly Enterprises–Missouri, Inc.,* 872 S.W.2d 522, 524 (Mo.Ct.App. 1994). A narrow exception to the employment-at-will doctrine exists, however, when an "employer's act of discharging the employee is violative of a statute, regulation based on statute, or a constitutional provision." *Lynch v. Blanke Baer,* 901 S.W.2d 147, 150 (Mo.Ct.App.1995) (citing *Johnson v. McDonnell Douglas Corp.,* 745 S.W.2d 661, 662 (Mo.1988) (en banc)).

■ Four categories of the public policy exception are recognized: (1) discharge of an employee because of his or her refusal to perform an illegal act; (2) discharge because an employee reported violations of law or public policy to superiors or public authorities; (3) discharge because an employee par-

---

**3.** The plaintiff was not a classic at will employee because his employment was subject to a written contract setting out a specific period of duration. However, throughout this case the parties have treated him as an at-will employee, and appropriately so. Paragraph 12 of the Employment Agreement contains a provision, which is the one exercised by the defendant here, for termination by either party on ninety days written notice which is unqualified by any limitation concerning cause. Paragraph 13 goes on to set out specific criteria for immediate termination sepa-

rate from the ninety day notice clause of paragraph 12, further clarifying beyond peradventure the parties' intention to permit an escape hatch for either party without the necessity of showing cause. Thus, the Employment Agreement functioned as an at-will employment contract provided only that the requisite notice be given, as was done here. Accordingly, the court finds that for the purposes of the retaliatory discharge claim the "at-will" employment contract analysis is properly applicable.

ticipated in acts that public policy would encourage, such as jury duty, seeking public office, asserting a right to collective bargaining, or joining a union; and (4) discharge because an employee filed a worker's compensation claim. *Id.* at 150. Plaintiff is apparently arguing that his claim falls in the second public policy exception category.

■ In order to prevail on his claim, plaintiff must show he was discharged because he "reported to superiors or to public authorities serious misconduct that constitutes a violation of the law and of ... well established and clearly mandated public policy." *Id.* at 150 (citing *Loomstein v. Medicare Pharmacies, Inc.,* 750 S.W.2d 106, 112 (Mo.Ct.App.1988); *Boyle v. Vista Eyewear, Inc.,* 700 S.W.2d 859, 878 (Mo.Ct.App.1985)). To meet his burden, plaintiff must present evidence to establish an exclusive causal connection between his discharge and reporting violations. *Id.* at 150–53 (citing *Clark,* 872 S.W.2d at 524–27; *Hansome v. Northwestern Cooperage Co.,* 679 S.W.2d 273, 275 (Mo. 1984) (en banc)).

■ Plaintiff contends that he was discharged for honoring his "obligation to faithfully serve the best interests of his patients" above his "employer's economic interest." He cites various Missouri statutes, as well as professional codes of ethics for physicians, which he contends recognize the public's interest in a physician's duty to faithfully serve the interests of his patients and, thus, establish this duty as a "clear mandate of public policy".[4] He also refers to the American Medical Association's Principles of Medical Ethics, the Hippocratic Oath and the Code of Ethical Conduct of the American College of Occupational and Environmental Medicine.

In determining whether plaintiff states a cause of action under Missouri law, the court finds the case of *Lay v. St. Louis Helicopter Airways, Inc.,* 869 S.W.2d 173 (Mo.Ct.App. 1993), instructive. In that case the plaintiff, an airline pilot, alleged that he was discharged in violation of public policy where his employer terminated him because he refused to take three flights which he sincerely believed, in exercising his professional judgment, would violate ethical codes and Federal Aviation Administration (FAA) regulations with which he was professionally and ethically bound to comply. *Id.* at 177. The court of appeals specifically found that the FAA's regulation concerning pilot responsibility and the ethical codes' requirement that a pilot use his best judgment were "not clear mandates which allow [an] employee to fall within the public policy exception." *Id.* The court went on to hold that neither the regulation cited nor the code of ethics provision "imposes a duty on an employer to refrain from terminating a pilot whose judgment calls are contrary to the employer's judgment." *Id.*

The court cannot meaningfully distinguish the facts of this case from those of *Lay.* Here, plaintiff claims he was discharged because he followed his own professional judgment in determining how his patients were to be treated. He cites very general statutory provisions and ethical rules which he claims support his decisions and the exercise of his discretion with respect to patient care. He has not, however, cited any provision which indicates that the public policy of the state of Missouri demands that his judgment prevail over the judgment of his employer regarding patient care and treatment.

Plaintiff contends that *Kirk v. Mercy Hospital Tri–County,* 851 S.W.2d 617 (Mo.Ct. App.1993), clearly establishes the existence of public policy in favor of plaintiff's "obligation to faithfully serve the best interests of

---

4. Plaintiff cites the following provisions:
   (1) Mo.Rev.Stat. §§ 334.100.2(4), 334.100.4 (subjecting a doctor's license to revocation for "misconduct, fraud, misrepresentation, dishonesty, unethical conduct or unprofessional conduct" in the performance of the doctor's professional duties)
   (2) Mo.Rev.Stat. § 334.100.2(5) (prohibiting conduct or practices which might be dangerous to the health of a patient or the public)
   (3) Mo.Rev.Stat. § 334.100.2(6) (prohibiting licensees to assist in violations of Mo.Rev.Stat. Chapter § 334.100)
   (4) Mo.Rev.Stat. § 287.120 (requiring employers to provide compensation to workers injured in the course of employment)
   (5) Mo.Rev.Stat. § 287.140 (obligating employers to provide medical care to employees to cure effects of work-related injuries)

his patients." The plaintiff in *Kirk* had diagnosed a patient with toxic shock syndrome, a condition which, if left untreated, results in death. *Id.* at 618. The nurse anticipated immediate doctor's orders for antibiotics for the patient's condition, but the orders never came. *Id.* She repeatedly discussed the situation with her superiors but was eventually told to "stay out of it." *Id.* The patient later died. Plaintiff was subsequently terminated, upon telling the patient's family that the patient's doctor had "pav[ed] her way to heaven," for what the defendant said was her making of "certain statements concerning the hospital, its staff or employees which were untrue and detrimental to the hospital." *Id.* The plaintiff contended that the true reason for her termination was her refusal to "stay out of" the emergency situation with which the patient was faced. The Court of Appeals found that it was a question of fact whether she was terminated for her statements to the family or for her attempted intervention in the patient's care and that, if it were the latter, that stated a cause of action. The Court of Appeals, an intermediate appellate court in Missouri, held that there was a clear mandate of public policy under Missouri's Nursing Practice Act that "would hold that the Hospital cannot lawfully require that Plaintiff 'stay out' of [her dying patient's] case because of the obvious injurious consequences." *Id.* at 622.

The court believes the facts of *Kirk* make it distinguishable from this case. Here, the

plaintiff has presented no evidence that there would be "obvious injurious consequences" if plaintiff followed defendant's directives regarding patient care and treatment. There is no evidence in the record that if plaintiff were to follow Dr. Welter's instructions, his actions could be viewed as "incompetence, gross negligence or misconduct" on his part. *See id.* at 622 (plaintiff's inaction in *Kirk* could have been viewed as incompetence, gross negligence or misconduct on her part). Nor is there any evidence that following the orders of Dr. Welter would have put plaintiff in a position which could be viewed as enabling another person to commit such wrongful or negligent acts. *See id.* (nurse's inaction could have been so viewed). The only evidence in the record in this case is that two apparently qualified doctors, plaintiff and Dr. Welter, differed in opinion with respect to patient care.[5] Neither one asserts that the other's actions fell below the acceptable standard of care of the profession, let alone that they amounted to gross or obvious misconduct. The court does not read in *Kirk* a public policy requirement that defendant not impose its objectively reasonable views regarding patient care upon its physicians.

■ As was stated in *Kirk,* the existence of a clear mandate of public policy must be determined with specific application to the facts of a particular case. 851 S.W.2d at 621. In *Kirk* there was an emergency, life-or-death situation in which the plaintiff was faced with complete inaction by the other

---

5. Dr. Welter testified by affidavit that the goal of occupational medicine is to return the injured employee to the workplace before any secondary gain associated with being off work develops. He stated that it is up to the occupational medicine physician to make a medical determination about what the employee is capable of doing in the workplace and then it is the employer's responsibility to determine whether there is work available within the restrictions set by the physician.

Plaintiff conceded that Dr. Welter's position is consistent with that of the American Medical Association, but disputes that it is in the best interest of the patient in any event. He contends that the College of Occupational and Environmental Medicine espouses a contrary position. Although he so contends, he has offered no evidence in support other than his own opinion. Moreover, as defendant points out, he has not shown he is qualified to render such an opinion.

He specifically stated in his deposition that he did not know whether the Association of Occupational Physicians has a position on this issue.

On this record, the court is hard-pressed to conclude that a jury could reasonably find that Dr. Welter's position, as to the respective roles of the physician and employer, runs contrary to the best interests of a patient. It is clear, however, that this evidence does not come close to the necessary showing that defendant's policies violated a standard of care acceptable in the occupational medicine profession. Thus, the court finds that plaintiff has not alleged, let alone made a sufficient showing, that the defendant's policies, or Dr. Welter's judgments, regarding patient care and treatment violated the applicable standard of care of the profession or are otherwise analogous to the apparent case of gross inaction in the face of an emergency which occurred in *Kirk.*

health care providers. According to her version of events, then, she was penalized for trying to intervene and get someone to care for a patient who was threatened with death if no one properly attended to her. The uncontroverted facts of this case, by contrast, indicate that plaintiff and Dr. Welter had, at worst, a professional disagreement with respect to the treatment and care of their patients.[6] To that extent, then, this case is far more like *Lay* than *Kirk*. In *Lay* the Missouri court was unwilling to find a public policy of vindicating an employee who refuses to bend to the reasonable professional judgment of the employer, even in the highly sensitive context of airline travel in which the difference in judgment could be a matter of life and death. The court is not persuaded, then, that there exists a public policy in Missouri, upon which a claim of wrongful discharge may be premised, which prohibits an employer from terminating a health care employee over a disagreement or difference of professional judgment where the judgment of each is within the bounds of reasonable care.

### 2. Kansas Law

The end result in this case is no different if Kansas law is applied. As in Missouri, the tort of retaliatory discharge is an exception to the long-standing Kansas rule that an employee can be terminated with or without cause at any time. *Murphy v. City of Topeka,* 6 Kan.App.2d 488, 493–96, 630 P.2d 186, 191–93 (1981); *Cain v. Kansas Corp. Comm.,* 9 Kan.App.2d 100, 103, 673 P.2d 451, 454 (1983). The exception is a narrow one and applies only if the discharge seriously contravenes public policy. *Cain,* 9 Kan.App.2d at 104, 673 P.2d at 454.

Kansas courts have recognized the cause of action in two general circumstances: (1) where an employee is discharged in retaliation for exercising or intending to exercise his or her rights under worker's compensation laws; and (2) where an employee is discharged for good-faith reporting or threatening to report a serious infraction of rules, regulations, or law pertaining to public health, safety and the general welfare by a coworker or employer ("whistleblowing"). *Dickens v. Snodgrass, Dunlap & Co.,* 255 Kan. 164, 176–77, 872 P.2d 252, 262 (1994).

Plaintiff does not argue, nor does it appear, that his claim falls squarely in either accepted Kansas category. Plaintiff did not report a serious infraction of rules, regulations, or law to either law enforcement officials or to company management. At best, plaintiff expressed disagreement with company management with respect to the treatment of certain of his patients. Plaintiff instead asks the court to recognize a new exception—that an employee may not be discharged based on his or her decision to act in a manner protected by law or for refusing to act in a manner which would be violative of the public policy of the state of Kansas. Even if the court were willing to expand the categories of recognized cases to include this kind of a claim, which is a dubious exercise by a federal court sitting in diversity jurisdiction unless there is a clearer indication than here that the state court would be inclined to do so if presented with the question, plaintiff's claim would in any event fail because he has not shown that his actions were protected by or in furtherance of a clear mandate of Kansas public policy. In other words, he has not shown that a clear mandate of Kansas public policy protects his alleged refusal to put the defendant's economic interests above the interests of his patients.

"Before courts are justified in declaring the existence of public policy ... 'it should be so thoroughly established as a state of public mind, so united and so definite and fixed that its existence is not subject to substantial doubt." *Palmer v. Brown,* 242 Kan. 893, 897, 752 P.2d 685, 687–88 (1988); *Dickens,* 255 Kan. at 164, 872 P.2d at 262. Plaintiff has cited no case, nor has this court found one, recognizing a public policy in favor of a physician's unqualified discretion in "faithfully serving the best interests of his patients."

---

**6.** The court notes that it broadly construes plaintiff's evidence to give rise to such an inference. Defendant characterizes the disagreement less as one of professional judgment, and more as one about plaintiff's communication skills, his ability to limit his judgment to medical restrictions, and his ability to determine appropriate accommodations for injured employees.

Such a policy is far from being so definite and fixed that its existence is not subject to substantial doubt.

Recently, the Kansas Supreme Court cited with approval the reasoning of *Cain v. Kansas Corporation Commission,* 9 Kan.App.2d 100, 673 P.2d 451 (1983). *See Dickens,* 255 Kan. at 164, 872 P.2d at 262. In *Cain,* the plaintiff security examiner claimed retaliatory discharge because he outspokenly advocated on behalf of consumers and investors. He alleged that his termination was in frustration of the objects of the Kansas Securities Act. *Id.* at 104, 673 P.2d at 454. That act provided that its purpose was to place the traffic of promoting and dealing in speculative securities under rigid governmental regulation and control to protect investors. *Id.* The Kansas Court of Appeals ultimately deemed the plaintiff's views to be "his own personal opinion on how the KCC should carry out the statutory purposes of the Securities Act" and not to be public policy. *Id.* at 104–05, 673 P.2d at 455. The court found it significant that the agency action was within the bounds of its discretion and that plaintiff had not alleged that agency policy toward consumers and investors was fraudulent, arbitrary or beyond its authority. *Id.*

While not precisely on point, *Cain* is helpful in determining what the Kansas Supreme Court would do if faced with the question presented here. As in *Cain,* the undisputed facts of this case indicate that plaintiff's actions were based on his own personal opinion as to how a patient should be treated and how an occupational medicine clinic should operate. There is no evidence, other than plaintiff's own personal belief, that the defendant was exercising its discretion improperly or unlawfully. There is no allegation or evidence that the defendant's policies, as expressed and implemented through the acts and communications of Dr. Welter, fell below the acceptable level of care of an occupational medicine clinic.

Plaintiff's own views are not public policy. The statutes and ethical codes he cites as "clear declarations of policy" require professional competency and conduct by persons licensed under the Kansas Healing Arts Act. Plaintiff has offered no evidence that the defendant's policies run counter to such requirements. Moreover, there is nothing in the record, or cases cited by the parties, indicating that an employer's economic interest in returning employees to work, or a medical clinic's consideration of that interest, runs counter to Kansas public policy or even the interest of the injured employee. Absent evidence of mistreatment, which is not present here, an employer's desire to return an injured employee to work in a position he or she is capable of performing is perfectly acceptable and well within the bounds of the law. *Cf. Barber v. Hallmark Cards,* No. 93–4087–SAC, 1994 WL 568872, at *12 (D.Kan. September 14, 1994) ("Kansas case law does not require the employer to take a 'hands off' approach with any employee who suffers a work-related injury. The employer has legitimate interests in seeing that the employee performs the required work, in determining if the injuries interfere with the employee's ability to do the work, and in minimizing the risk that an employee's injuries will be exacerbated by certain work.").

In short, the court finds that, if faced with the issue, Kansas courts would not recognize a public policy exception to the employment-at-will doctrine under the facts of this case. Although the analysis is somewhat different, the result is the same under either state's law.

*B. Breach of Contract Claim*

Plaintiff contends that defendant's true reason for firing the plaintiff, that he was discharged because he refused to abandon his obligations to faithfully serve the best interests of his patients and instead serve defendant's business interests, violated the covenant of good faith and fair dealing implied in the parties' employment contract. As the court has already stated, the parties dispute whether Missouri or Oklahoma law applies to plaintiff's claim.

▬ To the extent that the parties' contract here is treated as an at-will employment contract, Oklahoma clearly would not recognize a cause of action for breach of an implied duty of good faith and fair dealing under the circumstances of this case. *See*

*Burk v. K–Mart Corp.,* 770 P.2d 24, 27 (Okla. 1989) (court held that there is no implied covenant of good faith and fair dealing that governs the employer's decision to terminate in an employment-at-will contract); *see also Avey v. Hillcrest Medical Ctr.,* 815 P.2d 1215, 1217 (Okla.Ct.App.1991); *Pytlik v. Professional Resources, Ltd.,* 887 F.2d 1371, 1378 (10th Cir.1989). Plaintiff does not contend otherwise.

To the extent that the fixed term with ninety-day notice termination provision might alter the analysis, because the contract here is not strictly at-will, the result would be the same. In *Devery Implement Co. v. J.I. Case Co.,* 944 F.2d 724 (10th Cir.1991), the Tenth Circuit reviewed the evolution of the implied covenant in Oklahoma. There it concluded that, while recognizing the implied covenant of good faith and fair dealing, Oklahoma courts limit its application and would not allow it to "trump a bargained-for termination-at-will clause," such as we have in this case. *Id.* at 728–29.

The situation under Missouri law is more complicated. Plaintiff has not cited any case in which a Missouri court indicated that an implied covenant of good faith and fair dealing governs an employer's decision to terminate in an employment-at-will contract, nor has this court found one.[7] At least one state court has found, however, that "Missouri law does not allow an at-will employee to circumvent the employment-at-will doctrine by alleging a covenant of good faith and fair dealing." *Neighbors v. Kirksville College of Osteopathic Medicine,* 694 S.W.2d 822, 824 (Mo.Ct.App.1985).

Several federal courts have relied on the *Neighbors* decision in dismissing claims for breach of an implied duty of good faith and fair dealing in the employment-at-will context. *See Stinson v. Burns & McDonnell Engineering Co.,* No. 85–1419, 1988 WL 53375 (W.D.Mo.1988) (dismissing claim for breach of duty of good faith and fair dealing in employment context); *Fink v. Revco Discount Drug Ctrs. Inc.,* 666 F.Supp. 1325 (W.D.Mo.1987) (same); *Giddings v. Shalom*

*Geriatric Ctr., Inc.,* No. 87–0924, 1988 WL 52221, at *2 (W.D.Mo. Apr. 29, 1988) (same); *see also Birnstill v. Home Sav. of America,* 907 F.2d 795, 798 (8th Cir.1990) (court upheld district court's decision that Missouri does not recognize a cause of action for breach of implied covenant of good faith and fair dealing in employment-at-will context). The *Stinson* court additionally found that:

> Plaintiff's reliance on a public policy exception to the employment-at-will doctrine to support a claim of breach of covenant is misplaced. First, application of this exception does not alter an employee's at-will status and provide contractual rights where none previously existed. The exception provides a tort remedy of wrongful discharge to the otherwise at-will employee. There is no legal basis for plaintiff's claim of breach of the ... covenan[t].

1988 WL 53375, at *3. This court is unwilling to imply a covenant of good faith and fair dealing in an employment-at-will contract absent some indication that Missouri would, contrary to the clear majority rule on this issue, do the same. *Cf. Kempe v. Prince Gardner, Inc.,* 569 F.Supp. 779, 781 (E.D.Mo. 1983) (without sufficient evidence to conclude that Missouri would adopt such an exception, court declined to recognize claim under theory of breach of an implied covenant of good faith and fair dealing in employment-at-will context).

However, the contract provision in effect here shifts the analysis somewhat. In *Morton v. Hearst Corp.,* 779 S.W.2d 268 (Mo.Ct. App.1989), the court dealt with a contract provision which permitted either party to terminate on sixty days notice. There this division of the Missouri Court of Appeals declined to follow the at-will line of cases, which reject the existence of the implied covenant, and, relying in part on *Hall v. Farmers Ins. Exchange,* 713 P.2d 1027 (Okla. 1985), recognized that the bad faith resort to a termination clause could state a cause of action. Nonetheless, under circumstances not significantly different from those which exist here, the court found that the employee

---

7. Only a small handful of states have implied such a covenant in the context of an employment-at-will contract, while the clear majority of jurisdictions have unequivocally rejected it. *Fink v. Kitzman,* 881 F.Supp. 1347, 1384 (N.D.Iowa 1995).

had failed to show a violation. Moreover, it stressed the *Hall* rationale that the exercise of the termination clause should not be used to deprive the employee of benefits already earned but not yet paid. Finding Mr. Morton had been paid for all the services he had rendered, it did not hesitate to draw the line at using the implied covenant as a basis to vitiate the freely bargained for right otherwise to terminate upon giving of the agreed notice. *Id.* at 273–74. Implicitly, the *Morton* court limited the *Hall* basis for recovery just the same as the Tenth Circuit explicitly found that Oklahoma would in *Devery Implement Co.*

▮ This case is much like *Morton,* and the court believes that the Missouri courts would similarly find no violation of the covenant here. First, it is clear that plaintiff received full compensation for his services rendered. The only question is whether the defendant could end his employment in January or had to wait until the expiration of that renewal period in August. The existence of the implied covenant in Missouri does not convert all employment contracts into ones for which good cause must be given for termination. Thus, the inquiry is limited to whether the particular basis for the termination in question amounted to bad faith. As the court has discussed at length, above, the only evidence presented by the plaintiff here is that he was terminated over a disagreement about the exercise of occupational medicine judgment. Although the plaintiff characterizes the defendant's motives as putting their customers' interest ahead of the patients, the evidence submitted is devoid of anything beyond a dispute concerning which of two permissible approaches is preferable, with no showing that the defendant's approach is harmful, in fact, let alone at variance with appropriate standards. As a matter of Missouri law, a termination because an employee insists on following his own dictates rather than his employer's valid directions would not be recognized as violating the implied covenant of good faith and fair dealing in an employment contract such as this one.

## V. CONCLUSION

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's motion for summary judgment (Doc. # 61) is granted.

**IT IS FURTHER ORDERED** that plaintiff's motion for an order permitting the jury to determine the amount of punitive damages (Doc. # 59) is denied as moot.

**IT IS SO ORDERED.**