**Madonna FARROW, Appellant,**

v.

**SAINT FRANCIS MEDICAL CENTER and Cedric C. Strange, Respondents.**

No. SC 92793.

Supreme Court of Missouri, En Banc.

Aug. 27, 2013.

---

Charles S. Kramer and Joseph D. Schneider, Riezman Berger, PC, St. Louis, for Farrow.

Thomas O. McCarthy and Brian M. O'Neal, McMahon Berger PC, St. Louis, for Saint Francis and Strange.

GEORGE W. DRAPER III, Judge.

Madonna Farrow (hereinafter, "Farrow") appeals from the circuit court's grant of summary judgment in favor of Saint Francis Medical Center (hereinafter, "Hospital") and Cedric C. Strange (hereinafter, "Doctor" and collectively "Defendants") on her eight-count petition that alleged violations of the Missouri Human Rights Act, section 213.010 *et seq.*, RSMo 2000 (hereinafter, "the MHRA"),[1] and other common law claims related to the termination of her employment. The circuit court's judgment is affirmed in part, and reversed in part. The case is remanded.[2]

## Factual and Procedural History

Viewed in the light most favorable to Farrow, the facts are as follows: Hospital,

1. All statutory references are to RSMo 2000 unless otherwise indicated.

2. This Court transferred this case after a *per curiam* opinion by the Missouri Court of Appeals, Eastern District. Portions of the court of appeals opinion are incorporated without further attribution. This Court has jurisdiction pursuant to Mo. Const. art. V, sec. 10.

a not-for-profit-corporation, hired Farrow in 1991 as a staff nurse to perform duties on Hospital's progressive cardiac floor. Farrow's compensation consisted of a base salary while working on the cardiac floor, with additional income earned by working overtime and "floating" to other floors or departments as needed. In August 1999, Farrow transferred to Hospital's radiology department and worked there primarily as a nurse. Farrow continued to float to other departments and accrue overtime.

In 2004, Farrow developed and oversaw Hospital's implementation of a peripherally inserted central catheter ("PICC") line procedure program. Implementation of this PICC line procedure eliminated Hospital's need to outsource this procedure to outside nurses and enabled Farrow to train other Hospital nurses on the process. In addition to developing and overseeing this program, Farrow continued to work in the radiology department without incident until December 2005.

In December 2005, Doctor approached Farrow and propositioned her about having an affair. Farrow rejected his proposition and attempted to laugh off the comments, which angered Doctor. Farrow told Doctor she thought he was kidding, his comments were inappropriate, and his anger made her uncomfortable, so she left the room. Farrow attempted to avoid working or speaking with Doctor after this incident and reported it to Hospital's human resources department.

In February 2006, Farrow maintained Doctor made another inappropriate sexual comment to her. Farrow was asked to work on an emergency procedure with Doctor. During that procedure, Farrow was paged by another doctor who needed her assistance on a procedure. Farrow answered the page with Doctor's permission. After finishing the discussion, Doctor whispered in Farrow's ear, "I understand now. You like the black stuff better than the white," referring to the ethnicity of the doctor Farrow had spoken to on the telephone. Farrow again rebuffed Doctor's comments and asked him to leave her alone. She left the room, and another nurse took over the nursing duties for the procedure. Farrow reported both incidents to the director of imaging services. Farrow was told the director would look into it, but the director did not respond to her.

After these two incidents, Farrow maintains she was subjected to retaliatory actions by Defendants. Specifically, Farrow was prohibited from performing PICC line procedures in the radiology department, and she stopped teaching other nurses how to perform the procedures because Defendants implemented a policy that prohibited any nurse from performing these procedures. Defendants directed that Farrow train a physician's assistant from Doctor's practice to perform the PICC line procedures. Farrow objected to this change in protocol because she believed a physician assistant was not authorized by law to administer PICC lines. Farrow complained to her supervisor about the policy change and sought the program's reinstatement, to no avail.

Farrow also contends Doctor made defamatory statements about the quality of her work. Farrow maintains Doctor berated, intimidated, harassed, and yelled at her in front of other Hospital employees. Farrow alleges Hospital acquiesced in these actions by allowing them to happen and by disciplining Farrow for various actions that she maintains did not warrant discipline.

In October 2006, Farrow placed documentation into her personnel file regarding Defendants' actions after she learned they were planning to terminate her. As a result, Farrow requested a transfer from

the radiology department back to the progressive cardiac floor, which would result in a decrease in her hourly salary. Farrow's request was granted; however, her new supervisor told Farrow she had been informed of the "problems in radiology," that she should not make any more complaints, and advised Farrow to keep her head down and do her job.

Despite transferring back to the progressive cardiac floor, Farrow suffered from anxiety, nervousness, insomnia, and concerns about keeping her job. In January 2007, Farrow placed additional documentation in her personnel file regarding the prior acts of Defendants. Hospital's president approached Farrow a few weeks later and inquired whether her transfer "worked out her problems." Farrow described her physical issues as a result of Defendants' actions, requested that the matter be investigated, and indicated she documented the events in her personnel file. Hospital's president indicated he would review the matter and her personnel file. Farrow and Hospital's president had a similar conversation in April 2007, but Hospital's president still had yet to review her personnel file or investigate her allegations from January 2007.

In May 2008, Farrow was written up for unprofessional conduct related to her negative attitude. Farrow maintains her supervisor advised her she should not review or be so concerned with the contents of her personnel file. After hearing this, Farrow went to the human resources department to review her file and discovered all of her documented complaints were missing. Later, Farrow encountered Doctor in a hallway. Doctor told Farrow he was "still going to get her out." Farrow

reported this incident to the human resources department, but no action was taken. Thereafter, Farrow alleges Hospital continued to retaliate against her by changing her compensation agreement, stripping her of hours, prohibiting her from working any overtime or floating to other departments, and scheduling her for less than forty hours a week.

Farrow was terminated on December 10, 2008. The notice of termination stated it was based upon her failure to meet customer service expectations. Farrow alleges her supervisor told her that, notwithstanding what the notice stated, her termination was based upon the "problems in radiology and her continuing bad attitude." Farrow filed a grievance challenging her termination pursuant to Hospital's internal grievance procedure on December 15, 2008. The internal grievance procedure moved through five levels of review before Farrow received a final response from Hospital's president that her grievance was denied on March 2, 2009.

On July 27, 2009, Farrow filed a complaint with the Missouri Commission on Human Rights (hereinafter, "the Commission"). Ten days later, she also filed a charge with the Equal Employment Opportunity Commission (hereinafter, "the EEOC"). The Commission issued Farrow a notice of the right to sue letter on December 19, 2009, indicating it was issuing it in conjunction with the EEOC's right to sue letter from November 16, 2009.[3] The right to sue letter indicated Farrow could bring a civil action based upon the allegations in her complaint against Defendants within ninety days of the issuance of the notice, and all proceedings with the Com-

---

**3.** The EEOC's right to sue letter stated 180 days had passed since Farrow filed her charge, but that it was unlikely it would be able to complete its administrative proceedings within 180 days from the date of the charge. The right to sue letter terminated all proceedings with the EEOC.

mission based upon her complaint were being terminated.

Farrow filed her initial petition against Defendants on March 18, 2010. Farrow filed a first amended petition on August 31, 2010, raising eight counts against Defendants. Count I alleged a violation of the MHRA for sexual harassment against both Defendants. Count II alleged a violation of the MHRA for retaliatory discrimination against both Defendants. Count III raised an additional claim of retaliatory discharge against Hospital only. Count IV asserted a claim for retaliatory discharge regarding Hospital's internal grievance procedure. Count V alleged a claim for common law wrongful discharge in violation of public policy against both Defendants. Counts VI, VII, and VIII raised claims of defamation, false light invasion of privacy, and tortious interference with a business expectancy, respectively, and were brought against Doctor only.

Defendants did not file an answer, but filed motions to dismiss or, in the alternative, motions for summary judgment on all claims raised in Farrow's first amended petition.[4] After hearing the argument on the motions, reviewing the documents submitted and the legal memoranda, the circuit court sustained Defendants' motions, finding there were no genuine issues as to any material fact, and Defendants were entitled to judgment as a matter of law. Farrow appeals.

## Standard of Review

The parties cite two separate standards of review for this appeal. Farrow alleges Defendants only raised summary judgment challenges to Counts I through IV of her first amended petition. With respect to Counts V through VIII, Farrow claims Defendants simply challenged the adequacy of the pleadings pursuant to their motions to dismiss. Defendants cite both standards of review and used them interchangeably throughout their brief. The circuit court's judgment stated, "[T]here is no genuine issue as to any material fact and that Defendants ... are entitled to summary judgment as a matter of law." It is clear from the record and the circuit court's judgment that the circuit court treated Defendants' motions as motions for summary judgment, and as such, this Court will review this appeal accordingly.

 This Court's review of an appeal from summary judgment is *de novo*. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). When considering an appeal from summary judgment, this Court reviews the record in the light most favorable to the party against whom judgment was entered and affords that party the benefit of all reasonable inferences. *Lewis v. Gilmore*, 366 S.W.3d 522, 524 (Mo. banc 2012). Summary judgment is appropriate when the record demonstrates there are no genuine issues of material

4. This Court recognizes a defending party is not required to file an answer prior to moving for summary judgment. *See* Rule 74.04(b) (proving "*at any time*, a party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may move with or without supporting affidavits for a summary judgment as to all or any part of the pending issues") and *Senkevech v. Vaughn*, 610 S.W.2d 399, 403 (Mo.App.W.D. 1980) (holding no answer is required under the rule which provides that the summary judgment motion may be filed at any time). However, for the sake of clarity and the orderly progression of litigation, it is the better practice to file an answer in an effort to narrow the issues before the circuit court for adjudication prior to summary judgment. Here, the parties were apprised that the motion to dismiss would be treated as a motion for summary judgment, both parties complied with the summary judgment procedures set forth in Rule 74.04, and the circuit court recognized such in its judgment.

fact and the moving party is entitled to judgment as a matter of law. *Hargis v. JLB Corp.*, 357 S.W.3d 574, 577 (Mo. banc 2011). "Summary judgment seldom should be used in employment discrimination cases, because such cases are inherently fact-based and often depend on inferences rather than on direct evidence." *Hill v. Ford Motor Co.*, 277 S.W.3d 659, 664 (Mo. banc 2009).

### Farrow's MHRA Claims

Five of Farrow's points on appeal address the dismissal of Counts I, II, and III of her amended petition and will be discussed together because they raise intertwined issues of law. In her first three points, Farrow argues the circuit court erred in entering summary judgment in Defendants' favor on these counts because the claims were pleaded properly, and there were genuine issues of material fact precluding judgment as a matter of law. Farrow claims any challenges relating to the timeliness of the pre-filing proceedings before the Commission were not raised before the agency and were not properly before the circuit court in light of *J.C.W. ex rel. Webb v. Wyciskalla*, 275 S.W.3d 249 (Mo. banc 2009).

*Timeliness of Commission Filing*

Defendants argue Counts I, II, and III fail to state a claim for relief because Farrow failed to satisfy the statutory prerequisites for filing a lawsuit under the MHRA. Section 213.075 governs the filing of complaints with the Commission for alleged acts of discrimination under the MHRA. It states:

> Any person claiming to be aggrieved by an unlawful discriminatory practice may make, sign and file with the commission a verified complaint in writing, within one hundred eighty days of the alleged act of discrimination, which shall state the name and address of the person alleged to have committed the unlawful discriminatory practice and which shall set forth the particulars thereof and such other information as may be required by the commission.

Section 213.075.1.

Defendants assert Farrow was required to file her complaint with the Commission within 180 days of the alleged discriminatory act, which was her discharge on December 10, 2008. Farrow filed her claim on July 27, 2009, which was 230 days beyond her termination date. The Commission issued a right to sue letter on December 19, 2009, pursuant to section 213.111.1, which requires the Commission to issue the letter if it has not completed its investigation within 180 days from the filing of the complaint, and the person aggrieved makes a request for the letter in writing.

Farrow asserts the Commission's issuance of the right to sue letter meant it implicitly found it had jurisdiction over her claims, and they were filed timely. Defendants argue the Commission had a duty to issue the right to sue letter pursuant to the statute regardless of whether it had proper jurisdiction over Farrow's claim. This Court disagrees with Defendants' contention.

"As a creature of statute, an administrative agency's authority is limited to that given it by the legislature." *State ex rel. Missouri Public Defender Com'n v. Waters*, 370 S.W.3d 592, 598 (Mo. banc 2012). "The rules of a state administrative agency duly promulgated pursuant to properly delegated authority have the force and effect of law and are binding upon the agency adopting them." *State ex rel. Martin–Erb v. Missouri Com'n on Human Rights*, 77 S.W.3d 600, 607 (Mo. banc 2002).

Section 213.030(7) directs the Commission to "receive, investigate, initiate,

and pass upon complaints alleging discrimination. . . ." After the filing of the complaint, the Commission's executive director shall investigate promptly the complaint. Section 213.075.3. Commission regulation 8 C.S.R. 60–2.025(7)(B) directs the Commission to dismiss or close a complaint at any stage for lack of jurisdiction or in the absence of any remedy available to the complainant. Hence, the Commission was required to determine its own jurisdiction even if it did not make a decision on the merits of Farrow's claim. Had the Commission determined Farrow's claim was untimely, it would lack the authority to issue the right to sue letter. The Commission's only option would be to close the complaint for lack of jurisdiction or the absence of any remedy. The Commission did not close or dismiss Farrow's complaint for want of jurisdiction; rather, it exercised its authority to issue the right to sue letter, thus implicitly finding Farrow's claim was timely.

*Judicial Review of the Issuance of Right to Sue Letter*

If Defendants wished to challenge the timeliness of Farrow's filing before the Commission, Farrow alleges they should have done so either while the complaint was pending, prior to the issuance of the right to sue letter, or pursuant to 8 C.S.R. 60–2.025(7), or section 536.150. Defendants allege they raised their challenge to the timeliness of Farrow's complaint at the earliest opportunity in their motions to dismiss and motions for summary judgment after Farrow filed her state court action. Defendants further assert they did not have to appeal the Commission's issuance of the right to sue letter because there is no precedent requiring a defendant to raise the issue with the agency or later in a motion to dismiss or motion for summary judgment. Defendants also claim it would have been futile to seek a

writ at the Commission after the right to sue letter was issued because issuance of the letter terminates the proceedings at the Commission.

The record reflects Defendants took no action whatsoever to challenge the timeliness of Farrow's complaint while it was pending prior to the issuance of the right to sue letter, despite having notice of the complaint. Commission regulation 8 C.S.R. 60–2.025(9) provides a respondent "shall be given an opportunity to present an oral or written statement of its position." Nothing in the regulation's language limits what "position" may be asserted by the respondent, and one such "position" may include a challenge to the timeliness of the complaint. Defendants failed to offer any objection based on timeliness during this time.

■ The Court disagrees, however, with Farrow's contention that Defendants could challenge the timeliness of her complaint pursuant to 8 C.S.R. 60–2.025(7)(E). That regulation provides, "Any person aggrieved by *the dismissal of a complaint* may obtain judicial review by filing a petition in the circuit court . . . within thirty (30) days after the mailing of the delivery of the notice of dismissal." (Emphasis added). Defendants did not file a complaint, and Farrow's complaint was not dismissed; to the contrary, she was issued a right to sue letter. This regulation does not provide Defendants with an avenue to challenge the timeliness of her complaint or the issuance of a right to sue letter.

Defendants could have sought relief, however, pursuant to section 213.085.2, which provides "any person who is aggrieved by a final decision, finding, rule or order of the commission may obtain judicial review by filing a petition in the circuit court . . . within thirty days . . . of the

commission's final decision." [5] Section 213.085.3 specifies that judicial review shall be in the manner provided by chapter 536. Section 536.150.1 provides in pertinent part:

> When any administrative officer or body existing under the constitution or by statute or by municipal charter or ordinance shall have rendered a decision which is not subject to administrative review, determining the legal rights, duties or privileges of any person . . . and there is no other provision for judicial inquiry into or review of such decision, such decision may be reviewed by suit for injunction, certiorari, mandamus, prohibition or other appropriate action, and in any such review proceeding the court may determine the facts relevant to the question whether such person at the time of such decision was subject to such legal duty, or had such right, or was entitled to such privilege, and may hear such evidence on such question as may be properly adduced, and the court may determine whether such decision, in view of the facts as they appear to the court, is unconstitutional, unlawful, unreasonable, arbitrary, or capricious or involves an abuse of discretion; and the court shall render judgment accordingly, and may order the administrative officer or body to take such further action as it may be proper to require. . . .

In *State ex rel. Martin–Erb*, this Court held section 536.150 permitted a claimant to seek a writ of mandamus when the procedures set forth in chapter 213 were not followed by the Commission's executive director. *State ex rel. Martin–Erb*, 77 S.W.3d at 608. Similarly, in *Pub. Sch. Retirement Sys. of Sch. Dist. of Kansas City v. Missouri Com'n on Human Rights*, 188 S.W.3d 35, 41 (Mo.App.W.D. 2006), the appellate court held mandamus would lie where the Commission's executive director's issuance of a right to sue letter was in violation of the Commission's prescribed procedures and applicable law.

█ Defendants are correct that the filing of a writ of mandamus *before the Commission* would have been futile once the right to sue letter was issued because issuance of the right to sue letter terminated all proceedings before the Commission related to Farrow's complaint. Section 213.111. The proper forum to file a writ of mandamus was with the circuit court pursuant to section 536.150, as the parties did in *Public School Retirement System*, challenging the Commission's jurisdiction to issue the right to sue letter based on its belief Farrow's claim was untimely. Thus, Defendants' argument that it challenged the timeliness of Farrow's complaint at the earliest opportunity is unavailing because they had ample opportunity to do so before the Commission issued the right to sue letter and in the time between its issuance and the filing of Farrow's state court action by way of writ of mandamus.

---

5. Defendants' argue section 213.085 is inapplicable because the issuance of a right to sue letter by the Commission does not constitute a "final decision, finding, rule, or order" because it did not reach the merits of Farrow's complaint. This Court disagrees. Section 213.111.1 states if the Commission has not completed its administrative processing and the person aggrieved so requests in writing, the Commission shall issue to the person claiming to be aggrieved a letter indicating his or her right to bring a civil action within ninety days of such notice against the respondent named in the complaint. The right to sue letter states the Commission made a determination it is unlikely that it will complete its investigation within the allotted time period. Thus, for all intents and purposes, the Commission has issued a "finding" regarding its ability to investigate that results in the issuance of the right to sue letter, which in turn terminates the proceedings.

*Timeliness as a Prerequisite to State Action*

Next, Farrow argues section 213.111 does not contain any express requirement that she timely file her claim with the Commission below as a prerequisite to filing her state court action. Farrow asserts this Court's holding in *Wyciskalla* determined that statutory preconditions to judicial proceedings involving statutory claims are not jurisdictional, but only prevent judicial remedies. As such, Farrow believes her compliance with the statutory requirements of section 213.111 are the only preconditions that must be met in order to file an action in circuit court asserting claims under the MHRA. Defendants disagree, arguing *Wyciskalla* does not apply to the MHRA.

In *Wyciskalla*, this Court clarified that there are only two kinds of jurisdiction: subject matter jurisdiction and personal jurisdiction. *Wyciskalla*, 275 S.W.3d at 252. "When a statute speaks in jurisdictional terms or can be read in such terms, it is proper to read it as merely setting statutory limits on remedies or elements of claims for relief that courts may grant." *Id.* at 255. Thus, a party's failure to comply with statutory mandates does not deprive a court of jurisdiction to render a decision. *Id.* at 254.

Section 213.111 governs the filing of a suit alleging violations of the MHRA in circuit court and states:

> If, after one hundred eighty days from the filing of a complaint alleging an unlawful discriminatory practice ..., the commission has not completed its administrative processing and the person aggrieved so requests in writing, the commission shall issue to the person claiming to be aggrieved a letter indicating his or her right to bring a civil action within ninety days of such notice

against the respondent named in the complaint.·... Such an action may be brought in any circuit court in any county in which the unlawful discriminatory practice is alleged to have occurred, either before a circuit or associate circuit judge.... Any action brought in court under this section shall be filed within ninety days from the date of the commission's notification letter to the individual but no later than two years after the alleged cause occurred or its reasonable discovery by the alleged injured party.

Section 213.111.1. Thus, the only requirements imposed by section 213.111 to file a claim under the MHRA are that: (1) an employee file a charge with the Commission prior to filing a state court action; (2) the Commission issue a right to sue letter; and (3) the state court action be filed within ninety days of the issuance of the right to sue letter but no later than two years after the alleged cause occurred or its reasonable discovery by the alleged injured party. The statute does not read, "If, after one hundred eighty days from the filing of a *timely* complaint...." This Court will not read such a requirement into the plain statutory language.

*Hospital's Status as an "Employer" under the MHRA*

Hospital alternatively asserts Counts I, II, and III fail to state a claim for relief because it is not an "employer" pursuant to section 213.010(7). Hospital offered into evidence five letters the Commission issued on previous MHRA claims filed against it stating that the Commission did not have jurisdiction over Hospital due to this statutory exemption. Hospital also submitted its articles of incorporation, bylaws, and various tax exemption letters to support its claim that it is "owned and operated" by a religious group.

Section 213.010(7) defines "employer" for purposes of the MHRA [6] and specifically excludes "corporations and associations owned and operated by religious or sectarian groups." Commission regulation 8 C.S.R. 60–3.010(9) states: "A corporation or association must be one hundred percent (100%) owned and operated by a religious or sectarian group and being a member of that religion or sect must be a requirement for employment for that corporation or association to be exempt as an employer" under the MHRA.

Hospital claims the regulation's wording conflicts with the statute, and therefore, the regulation is invalid. "The interpretation and construction of a statute by an agency charged with its administration is entitled to great weight." *Mercy Hospitals East Communities v. Missouri Health Facilities Review Comm.*, 362 S.W.3d 415, 417 (Mo. banc 2012). When the statute is silent or ambiguous on an issue, the Commission has the power to form policy and make necessary rules to fill gaps left by the legislature. *See Utility Serv. Co., Inc. v. Dep't of Labor and Indus. Relations*, 331 S.W.3d 654, 660 (Mo. banc 2011). The Commission's regulations relating to the MHRA are "entitled to a presumption of validity" and "should not be judicially invalidated except for weighty reasons and are to be sustained unless unreasonable and plainly inconsistent with the [statutes]." *State ex rel. Missouri Public Defender Com'n*, 370 S.W.3d at 602; *Utility Serv. Co.*, 331 S.W.3d at 659.

Section 213.010(7) is silent regarding what constitutes "owned and operated by religious or sectarian groups." The Commission exercised its properly delegated authority to interpret this phrase by promulgating 8 C.S.R. 60–3.010(9) to fill the gap left by the legislature. Hence, there is no conflict between the regulation and the statute.

When applying 8 C.S.R. 60–3.010(9) to the case at bar, Hospital's claim for an exemption fails because it cannot demonstrate it meets both requirements, specifically, that it is "one hundred percent owned and operated by a religious or sectarian group *and* being a member of that religion or sect must be a requirement for employment for that corporation or association to be exempt as an employer." (Emphasis added). Hospital failed to acknowledge or explain its compliance with the "membership requirement" to support its exemption claim. Finally, Hospital's reliance on the discussion of this exemption in *St. Louis Christian Home v. Missouri Com'n on Human Rights*, 634 S.W.2d 508 (Mo.App.W.D.1982) is misplaced given that the case was decided prior to the enactment of 8 C.S.R. 60–3.010(9), and any dicta discussing its promulgation while the appeal was pending was advisory in nature.

Even if 8 C.S.R. § 60–3.010(9) had not been promulgated, Hospital still could not qualify for the statutory exclusion for employers that are "corporations and associations *owned and operated* by religious or sectarian groups." Section 213.010(7) (emphasis added). Hospital contends that it is excluded from the definition of "employer" under this language because its articles of incorporation require that it be "operated as a Catholic Hospital." By its plain language, however, this statutory exclusion applies only if the employer is owned *and* operated by a religious group. Hospital has not shown—and cannot show—that it is owned by a religious or sectarian group:

6. Section 213.010(7) provides, " 'Employer' includes the state, or any political or civil subdivision thereof, or any person employing six or more persons within the state, and any person directly acting in the interest of an employer, but does not include corporations and associations owned and operated by religious or sectarian groups."

 Hospital is a Missouri non-profit corporation, organized under chapter 355, RSMo. Non-profit corporations do not have owners. Shareholders of general business (or "for-profit") corporations are generally thought of as the "owners" of such corporations. *But see* Richard A. Booth, *Who Owns A Corporation and Who Cares?*, 77 Chicago–Kent L.Rev. 147, 150 (2001) ("stockholder ownership theory has been under attack almost from its conception"). On the other hand, non-profit corporations do not have shareholders or any other way for third parties (whether individuals or entities) to assert a similar "ownership" role. *See Adams v. Christie's Inc.*, 880 A.2d 774, 781 (R.I.2005) ("one key distinction between nonprofit corporations and for-profit corporations is that in a nonprofit corporation shareholders/members do not have a proprietary interest in the corporation, as they do in a for-profit corporation").

Hospital offers no evidence that it is owned by the Catholic Church or the Archbishop of the Diocese of Springfield/Cape Girardeau. Hospital's bylaws give the power to appoint board members to the chairperson of the board of Saint Francis Healthcare System, Inc. ("System"), subject to the prior approval of the Archbishop. At most, System is Hospital's sole "member," not its owner. Under section 355.066(21), "members" are persons entitled to vote for the election of directors.[7] Nothing in that statute or else-where in chapter 355 gives "members" the rights and obligations of owners. Similarly, the Bishop has the right to review and approve any amendments to the Hospital's articles of incorporation and, in some circumstances, amendments to its bylaws. Such rights are contractual, however, and do not come from—nor do they create—the status of "owner" for the Bishop, the Catholic Church or the System.

The language of section 213.010(7) is plain and unambiguous. Regardless of whether or to what extent Hospital is "operated" by a religious group, Hospital cannot be excluded from the definition of "employers" that are subject to suit under the MHRA unless it also proves that it is "owned" by that religious group. Because Hospital is a Missouri non-profit corporation, and because Missouri non-profit corporations organized under chapter 355 do not have "owners", Hospital cannot qualify for this statutory exclusion and thereby cannot escape potential liability under the MHRA.

The circuit court erred in dismissing Counts I, II, and III of Farrow's first amended petition. The circuit court's judgment is reversed with respect to these counts.[8]

## Retaliatory Discharge Related to the Hospital's Internal Grievance Procedure

In her fifth point, Farrow claims the circuit court erred in granting summary

---

7. Even though Hospital's bylaws declare that System is its sole member, it is not clear that System's right to appoint directors actually qualifies it as a "member." *See* Section 355.066(21)(b) (regardless of the title given in articles or bylaws, a person is not a "member" by virtue of its right to designate—as opposed to vote for—a director). For purposes of this opinion, however, the Court assumes that System is Hospital's sole member.

8. In her sixth and seventh points, Farrow alternatively argues if the circuit court had the authority to review the timeliness of her MHRA claim, it was still error for it to enter judgment in Defendants' favor on Counts I, II, and III of her petition based upon principles of waiver, equitable estoppel, and public policy arguments favoring the utilization of internal grievance procedures over civil litigation. These points need not be addressed in light of this Court's holding regarding the timeliness of Farrow's claims.

judgment in Hospital's favor on Count IV, her claim for retaliatory discharge related to Hospital's internal grievance procedure. Count IV alleged Hospital's refusal to provide Farrow with meaningful review of the termination of her employment was undertaken to further retaliate and discriminate against her. Farrow argues discrimination by an employer during its internal post-termination appeal process is actionable under the MHRA because it deprived her of one or more of the privileges of her employment, the right to sue letter was legally sufficient to include such a claim, and the record established genuine issues of material fact exist that precluded summary judgment on this count.

 In order to exhaust administrative remedies under the MHRA, a claimant must give notice of all claims of discrimination in the administrative complaint. *Alhalabi v. Missouri Dep't of Natural Resources*, 300 S.W.3d 518, 525 (Mo. App.E.D.2009). "[A]dministrative complaints are interpreted liberally in an effort to further the remedial purposes of legislation that prohibits unlawful employment practices." *Id.* "As a result, administrative remedies are deemed exhausted as to all incidents of discrimination that are likely or reasonably related to the allegations of the administrative charge." *Id.* "Further, the scope of the civil suit may be as broad as the scope of the administrative investigation which could reasonably be expected to grow out of the charge of discrimination." *Id.*

 Farrow argues her claim of post-termination retaliation related to Hospital's internal grievance procedure is reasonably related to the allegations in the charge of discrimination she filed with the Commission, and an administrative investigation of post-termination retaliation reasonably could be expected to grow out of the allegations contained in her charge.

This Court disagrees. A liberal reading of the charge of discrimination clearly indicated Farrow limited the scope of her claim to the events that occurred prior to her December 2008 discharge. The charge of discrimination contains no allegations whatsoever that would put Hospital on notice that she intended to raise additional claims regarding retaliation for its treatment of her while she sought relief under Hospital's internal grievance procedure. The first time Hospital was apprised of this claim was in Farrow's first amended petition. Thus, the charge of discrimination was not likely or reasonably expected to lead to an investigation of adverse employment practices committed during Hospital's internal grievance procedure. Since Farrow failed to exhaust her administrative remedies by not raising this charge of discrimination below during the Commission's investigation, this Court need not address her additional arguments supporting her claim. The circuit court properly granted summary judgment in Hospital's favor on Count IV.

### Wrongful Discharge

In her fourth point, Farrow argues the circuit court erred in granting judgment in favor of Defendants on Count V, wrongful discharge under the public policy exception based upon the Nursing Practice Act (hereinafter, "the NPA"), sections 335.011 to 335.096. Farrow argues the claim was pleaded properly, and there are genuine issues of material fact precluding summary judgment. Alternatively, Farrow asserts she should have been granted leave to amend her petition if the claim was pleaded insufficiently. Hospital counters that Count V fails to state a claim because it was not pleaded with particularity, rendering Farrow's claims too vague to support a public policy exception cause of action.

*Farrow's Claim Against Doctor*

■■■ Preliminarily, we note Farrow brought her wrongful discharge claim against both Hospital and Doctor. "[A] wrongful discharge cause of action requires an employer/employee relationship." *Brooks v. City of Sugar Creek,* 340 S.W.3d 201, 213 (Mo.App.W.D.2011). Doctor acted only in a supervisory manner with respect to Farrow's work duties. Hospital was her employer, not Doctor. Therefore, since Farrow cannot establish an employer-employee relationship existed between her and Doctor as a matter of law, the circuit properly entered summary judgment in Doctor's favor on Count V. *Chandler v. Allen,* 108 S.W.3d 756, 764 (Mo.App.W.D.2003).

*Farrow's Claim Against Hospital*

■■■ Generally, an employer can discharge an at-will employee for any reason. *Keveney v. Missouri Military Acad.,* 304 S.W.3d 98, 101 (Mo. banc 2010). There are exceptions and limits, however, to the at-will employment doctrine. For example, an employer cannot terminate an at-will employee for being a member of a protected class, such as "race, color, religion, national origin, sex, ancestry, age or disability." *Id.* (quoting section 213.055). Further, this Court has adopted the following public policy exception to the at-will employment doctrine:

> An at-will employee may not be terminated (1) for refusing to violate the law or any well-established and clear mandate of public policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or rules created by a governmental body or (2) for reporting wrongdoing or violations of law to superiors or public authorities.... If an employer terminates an employee for either reason, then the employee has a cause of action in tort for

wrongful discharge based on the public-policy exception.

*Fleshner v. Pepose Vision Institute, P.C.,* 304 S.W.3d 81, 92 (Mo. banc 2010).

■■■ This exception is drawn narrowly. *Margiotta v. Christian Hosp. Northeast Northwest,* 315 S.W.3d 342, 346 (Mo. banc 2010). This Court recognizes public policy is not found "in the varying personal opinions and whims of judges or courts, charged with the interpretation and declaration of the established law, as to what they themselves believe to be the demands or interests of the public." *Id.* (quoting *In re Rahn's Estate,* 316 Mo. 492, 501, 291 S.W. 120, 123 (Mo.1926)). Rather, a wrongful discharge action must be based on a constitutional provision, a statute, a regulation based on a statute, or a rule promulgated by a governmental body. *Margiotta,* 315 S.W.3d at 346. Absent such explicit authority, an employee's wrongful discharge claim fails as a matter of law. *Id.*

Hospital relies on this Court's holding in *Margiotta* to support its position regarding the degree of particularity Farrow was required to plead in order to state a claim for wrongful discharge based upon public policy contained in the NPA. In *Margiotta,* an image technician brought suit against his former employer, a hospital, alleging he was terminated for reporting violations of federal and state regulations pertaining to patient care at the hospital. *Id.* at 344. The hospital alleged it terminated the technician for a violent outburst. *Id.* at 345. In his petition, the technician cited a federal and Missouri regulation that generally discussed providing safe settings for patient care. *Id.* The circuit court entered summary judgment in the hospital's favor. *Id.* In affirming the circuit court's judgment, this Court in *Margiotta* stated:

> A vague or general statute, regulation, or rule cannot be successfully pled un-

der the at-will wrongful termination theory, because it would force the court to decide on its own what public policy requires. Such vagueness would also cause the duties imposed upon employers [to] become more vague and create difficulties for employers to plan around liability based on the vagaries of judges.... The mere citation of a constitutional or statutory provision in a [pleading] is not by itself sufficient to state a cause of action for retaliatory discharge, the plaintiff must demonstrate that the public policy mandated by the cited provision is violated by the discharge.

*Id.* at 346–47 (internal citations and quotations omitted). This Court found the statute and regulation cited by the technician were so vague and generalized that they were inapplicable to the conduct he reported to his supervisors more than two years prior to his discharge. *Id.* at 347–48.

Farrow cites *Kirk v. Mercy Hospital Tri–County*, 851 S.W.2d 617 (Mo.App.S.D. 1993), to support her argument that she pleaded sufficient facts to support her cause of action. In *Kirk*, a registered nurse was discharged after a patient under her care did not receive timely antibiotics for an infection that caused her death. *Id.* at 618. While attempting to get treatment for the patient, the nurse's supervisor told her to "document, report the facts, and stay out of it" when antibiotics were not prescribed initially. *Id.* After the patient died, the nurse offered to obtain medical records for the family and stated the doctor was "paving her way to heaven" by his failure to treat patient timely. *Id.*

The hospital discharged the nurse, stating the cause for her dismissal was due to her making certain statements that were untrue and detrimental to hospital employees. *Id.* The nurse sued the hospital for wrongful discharge, alleging her discharge violated a clear mandate of public policy as reflected in the NPA. *Id.* at 620–21. The nurse's pleadings did not cite a specific statute, regulation, or constitutional provision that prohibited the actions taken by the hospital, but only cited the general provisions of the NPA. *Id.* at 621.

The appellate court held the NPA and corresponding regulations "reveal a clear mandate of public policy." *Id.* at 622. The court noted the nurse could risk discipline and prosecution by the State Board of Nursing if she ignored improper treatment of a patient under her care. *Id.* Further, the court stated the nurse's inaction could be viewed as incompetence, gross negligence, misconduct or as assisting and enabling other persons to commit those acts, all of which were a violation of her duties under the NPA. *Id.* As such, the court determined the nurse pleaded sufficient facts to demonstrate a cause of action for wrongful discharge under the public policy exception. *Id.* The appellate court reversed the entry of summary judgment in the hospital's favor, holding that two plausible, yet contradictory, reasons were cited in the record for the nurse's dismissal, making summary judgment improper. *Id.* at 622–23.

Likewise in *Hughes v. Freeman Health System*, 283 S.W.3d 797 (Mo.App.S.D. 2009), a nurse was terminated after a patient received inadequate medication while under her care. *Id.* at 799. Two days after the incident, a hospital supervisor told the nurse to first remove and rewrite, then make an addendum to, her patient care progress notes that criticized a physician's actions. *Id.* This directive was in violation of the hospital's written policy, which stated, "Previously written notes shall not be altered at a later date." *Id.* The nurse refused to destroy her original notes, but agreed to rewrite or add an addendum, yet was discharged. *Id.* The

hospital stated the nurse was discharged for jeopardizing the health and safety of her patient. *Id.*

The nurse sued the hospital alleging wrongful discharge for failing to follow directives that would have been contrary to a strong mandate of public policy by refusing to alter her progress notes. *Id.* at 800. The circuit court entered summary judgment in the hospital's favor. *Id.* at 798. The appellate court reversed the circuit court's judgment, relying on the holding in *Kirk. Id.* at 800–01. The court noted that the nurse, licensed under the NPA, was required to document what actions are taken in relation to a patient's care to uphold her duties under the NPA. *Id.* at 801. The court stated the deletion of her progress notes criticizing the physician could subject the nurse's license to suspension or revocation for misconduct, fraud, misrepresentation or dishonesty. *Id.* The court concluded the record was unclear whether the nurse was discharged for refusing to delete portions of her progress notes or for the reasons suggested by the hospital. *Id.* As such, entry of summary judgment in hospital's favor was improper.[9] *Id.*

This Court finds Farrow's allegations are pleaded sufficiently to overcome summary judgment because they are more akin to those presented in *Kirk* and *Hughes* rather than *Margiotta.* Farrow's first amended petition avers she was terminated, at least in part, for her objection to, outspoken disapproval of, and failure to comply with, the changes to the PICC line procedures instituted by Hospital that required non-nurses to perform these proce-

dures. Farrow asserts Hospital's use of non-nurses to administer PICC lines was in violation of the NPA, stating the practice would reduce the quality of health care, increase patient cost, and put patients at risk. Farrow's petition states as a nurse, the NPA regulates her license and her job duties, which reflects the well-established and clear mandate of public policy to serve the best interests of her patients. Farrow's petition cited four specific sections of the NPA: section 335.016(8), defining the registered nursing profession; section 335.021, creating the State Board of Nursing; section 335.036, authorizing the State Board of Nursing to adopt rules and regulations to carry out the provisions of the NPA; and section 335.066.2, subjecting nurses to various forms of discipline for failure to comply with provisions of the NPA regardless of whether they are instructed by a doctor or superior to do so. Farrow also cited two Missouri regulations, 4 C.S.R. 200–2.010(1)(A).1,[10] which emphasizes the promotion of safe practices, and 4 C.S.R. 200–4.030(8),[11] which recognizes the policy is for the benefit of the public. Farrow averred in her petition that her objections and refusal to follow Hospital's directive to have non-nurses administer PICC lines was an attempt to comply with the NPA and the cited regulations and were the basis of her wrongful discharge.

Recognizing the NPA encompasses a "clear mandate of public policy" per the holdings in *Kirk* and *Hughes,* this Court finds Farrow's allegations are not so vague, general or amorphous to warrant summary judgment. Although this Court

---

9. It is unclear whether the nurse in *Hughes* cited the NPA in her pleadings from the facts presented in the appellate opinion. Nevertheless, the appellate court determined the nurse pleaded sufficient facts to overcome the entry of summary judgment, relying on several provisions of the NPA and the holding in *Kirk.*

10. 4 C.S.R. 200–2.010(1)(A).1 is now 20 C.S.R. 2200–2.010(2)(A).

11. 4 C.S.R. 200–4.030(8) is now 20 C.S.R. 2200–4.030(8).

cautioned in *Margiotta* that vague allegations would "cause the duties imposed upon employers [to] become more vague and create difficulties for employers to plan around liability based on the vagaries of judges," no such difficulty arises here when examining the public policies embodied in the NPA. The NPA is a short statutory scheme, primarily consisting of rules regarding licensing, discipline, and State Board of Nursing regulations. The remaining few statutes under the NPA that enumerate nursing duties do not pose significant impediments for hospitals and other employers to plan around liability.[12]

Finally, Hospital claims Farrow was required to report the misconduct that constituted a violation of public policy to her supervisors, which she failed to do. When viewing the facts in the light most favorable to Farrow, Hospital's assertion is flawed. The record reflects Farrow's first amended petition stated she "complained to supervisors about Defendants' efforts with respect to the [PICC line] program in order to comply with the policies established by the [NPA] and related regulations...." Farrow also alleged she "further complained to superiors about the denigration of health care effected by the change in the PICC program for the same reason."

The record submitted on Count V presents several plausible, yet contradictory, explanations for Farrow's discharge. Hospital's notice of termination stated it was based upon Farrow's failure to meet customer service expectations. Farrow alleges her supervisor told her that, notwithstanding what the notice stated, her termination was based upon the "problems in radiology and her continuing bad attitude." Farrow asserts her discharge was due to retaliation for refusing Doctor's sexual advances and in retaliation for her opposition to the changes in the PICC line protocol. Since resolution of the matter will require the drawing of inferences from disputed facts and Farrow's amended petition sufficiently invokes the public policy exception to the at-will employment doctrine, this Court holds the circuit court erred in sustaining summary judgment in Hospital's favor on Count V. *See Kirk*, 851 S.W.2d at 622–23, and *Hughes*, 283 S.W.3d at 801.

### Defamation

In her eighth point, Farrow alleges the circuit court erred in granting summary judgment in Doctor's favor on Count VI, her defamation claim. Farrow alleges the claim was pleaded properly, and alternatively, there were genuine issues of material fact that precluded summary judgment. Doctor argues Farrow's defamation claim is barred by the statute of limitations set forth in section 516.140.

In order to prevail on a defamation claim, Farrow must establish: "1) publication, 2) of a defamatory statement,

12. Hospital argues Farrow waived her right to rely on section 335.017, which governs the administration of intravenous fluid treatment, and section 334.735, which governs physician assistant duties, among other things, because these statutes were raised for the first time on appeal. It is undisputed Farrow failed to cite these specific statutes in her pleadings below. Further, Hospital argues even if Farrow has not waived her right to rely on the statutes, they do not support a wrongful discharge claim because they do not specify that any professionals are prohibited from administering intravenous fluid, in that the petition does not allege performance of the PICC line procedure by a physician assistant violates or is prohibited by the NPA. It is equally undisputed Hospital did not raise this defense to Farrow's claims in its pleadings below. Since neither argument was presented to the circuit court during its summary judgment proceedings, it is improper for this Court to comment upon the merits of such.

3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation." *Overcast v. Billings Mut. Ins. Co.,* 11 S.W.3d 62, 70 (Mo. banc 2000). Count VI of Farrow's amended petition alleged Doctor's statements regarding her job performance were defamatory because they accused her of committing violations of the NPA, ethics, state and federal law, and exposed her to contempt, ridicule, and lowered her in the eyes of the community. Further, Farrow alleged the statements injured her position as a nurse in the medical community by imputing a lack of capacity or fitness to perform her nursing duties. Farrow contended that as a direct result of Doctor's publication of these false statements, her reputation was damaged in the community at large and at Hospital.

On appeal, Farrow argues Doctor's defamatory statements regarding her job performance damaged her by causing her termination, which occurred in December 2008. Farrow believes the time for filing her defamation claim under section 516.100 began to run at this time, in that her cause of action accrued only when the last item of damage occurred, specifically, her termination.

 "Statutes of limitation are favored in the law and cannot be avoided unless the party seeking to do so brings [itself] strictly within a claimed exception." *White v. Zubres,* 222 S.W.3d 272, 276 (Mo. banc 2007). An action for defamation must be brought within two years of the publication of the defamatory statements. Section 516.140; *State ex rel. Allen v. Barker,* 581 S.W.2d 818, 821 n. 2 (Mo. banc 1979). Section 516.100 states that civil actions can only be commenced provided:

the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained.

 Farrow documented Doctor's comments regarding her job performance in her personnel file in October 2006 because she believed they were in retaliation for rejecting his sexual advances. Farrow added further documentation in January 2007 because she was concerned for her job, worried about continued retaliation, and was suffering anxiety and insomnia. By documenting Doctor's publication of these comments, Farrow demonstrated she sustained damages prior to her termination. However, section 516.140 requires damages be sustained *and* capable of ascertainment for a cause of action to accrue.

 In *Powel v. Chaminade College Preparatory, Inc.,* 197 S.W.3d 576, 584 (Mo. banc 2006), this Court stated damages were capable of ascertainment and the statute of limitations begins to run when "a reasonable person would have been put on notice that an injury and substantial damages may have occurred and would have undertaken to ascertain the extent of the damages." Moreover, this Court has held damages are ascertainable "when the fact of damage can be discovered or made known, not when the plaintiff actually discovers injury or wrongful conduct." *Klemme v. Best,* 941 S.W.2d 493, 497 (Mo. banc 1997). "All possible damages do not have to be known, or even knowable, before the statute accrues." *Id.* This is an objective test, and when the facts are uncontested, the statute of limitations issue can be decided by the court as a matter of law. *State ex rel. Marianist Province of U.S. v. Ross,* 258 S.W.3d 809, 811 (Mo. banc 2008).

Farrow's amended petition does not allege Doctor terminated her or that Doctor's defamatory statements caused her termination. Rather, Farrow alleged, "Such damages were imposed upon [her] at least as late as the confirmation of her termination by [Hospital], and only became known and ascertainable at that time."

However, reading the amended petition as a whole, it is evident Farrow took steps to protect herself from any adverse employment action by placing documentation regarding Doctor's behavior in her personnel file in October 2006 and seeking a transfer to another department. Farrow's new supervisor was apprised of her "problems in radiology" and advised Farrow to keep her head down while she did her job. Farrow again documented complaints against Doctor after her transfer in January 2007 and continued to encounter him at Hospital where he threatened to have her terminated. Thus, Farrow's damages for defamation against Doctor were *capable* of ascertainment as early as October 2006, even though the *extent* of her damages were not complete or fully known until she was terminated in December 2008. Hence, Farrow's claim for defamation filed in March 2010 was beyond the two year statute of limitation imposed by section 516.140. The circuit court properly dismissed Count VI.

### False Light Invasion of Privacy

In her ninth point, Farrow avers the circuit court erred in granting judgment in Doctor's favor on Count VII, her false light invasion of privacy claim, because it was pleaded properly, and alternatively, there were genuine issues of material fact that precluded summary judgment. Count VII avers Doctor's statements about her job performance placed her in a false light that would be highly offensive and objectionable to a reasonable person under the circumstances because they were publicly attributed to her characteristics, conduct, or beliefs and were false. Farrow claims she took affirmative steps to reduce her contact with Doctor after he made sexually inappropriate comments to her. However, on the few occasions she was unable to avoid him, he continued to make inappropriate and offensive comments to her. Farrow states that instead of Doctor leaving her alone after she disengaged from him, he made comments to other Hospital personnel holding her out in a false light, including those in the radiology department. Farrow contends when Doctor made these comments, he knew Farrow would be justified in the eyes of the community in feeling seriously offended and aggrieved by this publicity. Farrow's amended petition further alleged Doctor acted with actual malice by publishing the statements with the knowledge that the statements were false or with reckless disregard for whether they were true or false when Doctor had serious doubt as to whether they were true.

Doctor argues Farrow's claim is time barred because the defamation statute of limitation applies to a false light invasion of privacy claim due to their similarities. Alternatively, Doctor argues Farrow's allegation fails to state a claim for false light invasion of privacy because his statements about her job performance do not rise to the level of offensiveness to sustain such a claim.

This Court has not recognized a cause of action for false light invasion of privacy. *Sullivan v. Pulitzer Broadcasting Co.,* 709 S.W.2d 475 (Mo. banc 1986). In *Sullivan,* this Court viewed the plaintiff's attempt to frame his claim as one for false light invasion of privacy as merely a means to circumvent the shorter statute of limitations period for defamation. *Id.* at 481. Despite flatly rejecting the recognition of this

cause of action under the specific facts in *Sullivan*, this Court acknowledged:

> It may be possible that in the future Missouri courts will be presented with an appropriate case justifying our recognition of the tort of 'false light invasion of privacy.' The classic case is when one publicly attributes to the plaintiff some opinion or utterance, whether harmful or not, that is false, such as claiming that the plaintiff wrote a poem, article or book which plaintiff did not in fact write. Another situation, although possibly actionable under defamation law, is when one uses another's likeness in connection with a story that has no bearing on the plaintiff.

*Id.* at 480 (internal citations omitted).

This Court discussed *Sullivan* and reaffirmed its holding in two subsequent cases: *Nazeri v. Missouri Valley College*, 860 S.W.2d 303 (Mo. banc 1993), and *State ex rel. BP Products North America Inc. v. Ross*, 163 S.W.3d 922 (Mo. banc 2005). In *Nazeri*, this Court acknowledged, "[It] has declined to recognize a cause of action for invasion of privacy when recovery is sought for untrue statements.... Recovery for untrue statements that cause injury to reputation should be in defamation." *Nazeri*, 860 S.W.2d at 317. Similarly, in *BP Products*, this Court discussed *Sullivan*'s analysis of the appropriate statute of limitation, but restated this Court declined to recognize the false light invasion of privacy cause of action because the facts in *Sullivan* presented nothing more than a classic defamation action. *BP Products*, 163 S.W.3d at 926.

Farrow urges this Court to adopt the reasoning in *Meyerkord v. Zipatoni*, 276 S.W.3d 319 (Mo.App.E.D.2008), the first Missouri appellate court to recognize false light invasion of privacy as a cognizable cause of action. In *Meyerkord*, a former employee sued his former employer when the employer failed to remove the employee's name as the registrant from a website the employer created that launched a viral internet marketing campaign for a gaming system. *Meyerkord*, 276 S.W.3d at 321. Shortly after the marketing campaign became active, bloggers, consumers, and consumer activist groups began voicing their concern, suspicion, and accusations over the campaign and those associated with it, including the former employee, on blogs and websites. *Id.* The employee filed a false light invasion of privacy action because his former employer failed to remove his name as a registrant and let the viral marketing campaign be publicly attributable to him. *Id.* at 321–22. The employee alleged his privacy had been invaded, his reputation and standing in the community was injured, and he suffered shame, embarrassment, humiliation, harassment, and mental anguish. *Id.* at 322. The employee further alleged his injuries would be ongoing because blogs and websites criticizing him would remain on the internet and were available for searching and viewing for an indefinite period of time. *Id.*

The court of appeals acknowledged this Court's holding in *Sullivan*, but stated the specific facts of *Meyerkord* represented a proper case for a false light invasion of privacy claim. *Id.* at 325. The court explained the difference between false light invasion of privacy and defamation and how the facts pleaded therein went beyond a classic defamation cause of action. *Id.* at 324–26. For example, the court stated under "defamation law, the interest sought to be protected is the objective one of reputation, either economic, political or personal, in the outside world." *Id.* at 324. By contrast, false light invasion of privacy the "interest ... affected is the subjective one of injury to the person's right to be let alone." *Id.* The court further explained,

"[W]here the issue is truth or falsity, the marketplace of ideas provides a forum where the answer can be found, while in privacy cases, resort to the marketplace merely accentuates the injury." *Id.* at 325.

The crux of Farrow's allegations is that Doctor made several false statements about her job performance that resulted in her termination from Hospital. Farrow's attempt to frame this cause of action as one where she merely wanted to be left alone is insufficient to differentiate it from her defamation claim. Here, Farrow is seeking to protect her reputation in the outside world, specifically with Hospital and the medical community where she resides. As such, her allegation is more akin to a classic defamation claim rather than a false light invasion of privacy claim. The circuit court properly granted summary judgment in Doctor's favor on Count VII.[13]

### Tortious Interference with a Business Expectancy

In her tenth point, Farrow states the circuit court erred in granting summary judgment in Doctor's favor on Count VIII, her tortious interference with a business expectancy claim, because it was pleaded properly, and alternatively, there were genuine issues of material fact that precluded summary judgment. Count VIII alleged Doctor interfered with Farrow's business expectancies attendant to her employment with Hospital and did so without justification or excuse. Doctor argues Farrow's allegation fails to state a claim because she did not bring her claim against a third party.

To prove a claim for tortious interference with a contract or business expectancy, the plaintiff must demon-

strate: (1) a contract or a valid business expectancy; (2) the defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct. *Western Blue Print Co., LLC v. Roberts,* 367 S.W.3d 7, 19 (Mo. banc 2012). "Absence of justification refers to the absence of a legal right to justify actions taken." *Id.* at 20 (quoting *Downey v. McKee,* 218 S.W.3d 492, 497 (Mo.App.W.D.2007)). If the defendant has a legitimate interest, economic or otherwise, in the expectancy the plaintiff seeks to protect, then the plaintiff must show that the defendant employed improper means in seeking to further only his or her own interests. *Id.* "Improper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." *Id.* (quoting *Stehno v. Sprint Spectrum, L.P.,* 186 S.W.3d 247, 252 (Mo. banc 2006)). Moreover, "[a]n action for tortious interference with a business expectancy will lie against a third party only." *Zipper v. Health Midwest,* 978 S.W.2d 398, 419 (Mo. App.W.D.1998). "Where the individual being sued is an officer or agent of the defendant corporation, the officer or agent acting for the corporation is the corporation for purposes of tortious interference." *Id.*

Farrow failed to allege facts supporting Doctor's lack of justification for the statements he made about her job performance. Doctor was Farrow's supervisor, and he had a legal right to criticize her work performance. Further, this action cannot be maintained against Doctor because

---

**13.** This Court need not resolve the question of the applicable statute of limitation for a false light invasion of privacy claim in light of the disposition of Farrow's claim.

while acting as Farrow's supervisor, he was Hospital's agent, not a third party. Thus, Farrow's claim against Doctor for tortious interference with business expectancy fails. The circuit court properly granted summary judgment in Doctor's favor on Count VIII.

### Conclusion

The circuit court erred in dismissing Counts I, II, III, and V of Farrow's first amended petition. The circuit court's judgment is reversed with respect to these counts. The circuit court's judgment is affirmed as to all remaining counts. The case is remanded.

RUSSELL, C.J., FISCHER, STITH, WILSON and TEITELMAN, JJ., concur.

BRECKENRIDGE, J., concurs in result.