

# In the
# Missouri Court of Appeals
## Western District

KACIE NICKEL, )
)
          Appellant, )    WD77898
)
v. )    OPINION FILED:
)    September 15, 2015
STEPHENS COLLEGE, ET AL., )
)
          Respondents. )

**Appeal from the Circuit Court of Boone County, Missouri**
The Honorable Kevin M.J. Crane, Judge

Before Division Four: Alok Ahuja, Chief Judge, Presiding, Gary D. Witt, Judge and
John M. Torrence, Special Judge

This appeal arises out of an action brought by Appellant Kacie Nickel ("Nickel"), in which Nickel sought damages against Respondent Stephens College ("Stephens") and three of its employees, Deborah Duren ("Duren"), Erin Zevely ("Zevely"), and Tony Coleman ("Coleman") (collectively "Respondents"), after Stephens issued Nickel a withdrawal following an attempted suicide. Nickel asserted claims against Respondents for Breach of Contract (Count I); Tortious Interference with a Contract (solely against the individual respondents - Count II); Negligent Infliction of Emotional Distress (Count III); Prima Facie Tort (Count IV); Negligent Supervision and Training (solely against

Stephens - Count V); Negligence Per Se (solely against Stephens - Count VI); and Negligence (Count VII). The trial court granted summary judgment in favor of Respondents on all counts and Nickel now appeals. For the following reasons, we affirm.

**Factual and Procedural History**[1]

On August 11, 2011, 21-year-old Nickel was admitted as a transfer student to Stephens. Stephens is a pro forma Missouri corporation in good standing and a private institution of higher education.[2] Individual Respondents were employees of Stephens at the time Nickel was a student.

Nickel listed in Stephens's "Application for Transfer Admission" that she had previously attended New Haven High School, which was a residential treatment program and boarding school. She did not disclose that the school was, in part, a mental health treatment program. Nickel also completed a "Health Statement" for Stephens stating that she had never received treatment or counseling or hospitalization for an emotional problem.

Stephens allows students living on campus to have approved pets. Nickel participated in this program and lived on campus in Prunty Residence Hall with her emotional support dog, "Hippo." On October 4, 2011, Nickel went to the Stephens's Counseling Center and indicated on an in-take form that she was having issues with stress, fears, and health problems. The following day, Nickel was seen by a doctor at the Counseling Center and told the doctor about her psychiatric history, including her

---

[1] We view the facts in the light most favorable to the non-moving party. *ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993).

[2] Stephens accepts funding from the federal and state government by participating in grant, loan and scholarship programs.

inpatient treatment at New Haven, prior hospitalizations, mental health and medical history, and medications. Nickel successfully completed the Fall semester.

Classes for the Spring 2012 Semester began on January 9, 2012. Two days later, on January 11, 2012, Nickel asked one of her friends to watch her dog, then drove to McBaine, Missouri, where she attempted to take her own life by ingesting excessive doses of over-the-counter medications.

Nickel's former boyfriend contacted the Columbia Police Department ("CPD") and reported that he and Nickel had broken off their three-month long relationship earlier in the day and he had received texts from Nickel threatening self-harm. A CPD officer was dispatched to Prunty Hall at Stephens based on this report. Campus Security contacted the Director of Security, Coleman, and notified him of the CPD report that Nickel was possibly a threat to harm herself. Coleman also called the Student Services Coordinator, Zevely, to inform her that they had a report that Nickel may attempt to harm herself.

Zevely located Nickel's emergency contact information, which identified Laurie Nickel ("Laurie") as a person to communicate with in the event of an emergency.[3] Zevely contacted Laurie to notify her of the emergency. A CPD officer also contacted Laurie to inform her of the emergency.

Later that evening, Laurie, Zevely, and Coleman all learned that Nickel had been located, was alive, and was in the Intensive Care Unit at University Hospital following a

---

[3] When Nickel was admitted to Stephens, she signed an "Emergency Locator Card" that identified her mother, Laurie, and her sister, Kendra Nickel ("Kendra"), as the persons to contact in the event of an emergency. Because Laurie and Kendra share the same last name as the plaintiff, we refer to them by their first names. No familiarity or disrespect is intended.

suicide attempt. On January 12, 2012, Laurie traveled from her home in Arizona to Columbia, Missouri to be with Nickel.

In the days following, Zevely, Duren, the Vice President for Student Services, along with Coleman and other members of the Stephens's Student Services Department, discussed Nickel's emergency medical situation. Zevely and Duren discussed the possibility of a medical withdrawal for Nickel and agreed to discuss the matter further with Nickel's mother, Laurie.

Laurie communicated with Nickel via text prior to arriving in Columbia. Nickel told Laurie that she was "sorry" and "want[ed] to stay in school." Laurie replied that she "want[ed] [her] to stay in school."

On or about January 13, 2012, Laurie called Zevely and asked whether Nickel could continue at Stephens. During this telephone conversation, the issue of Nickel's age or ability to speak on her own behalf was not discussed, and at no time during the conversation did Laurie request that anyone from Stephens speak directly with Nickel about her status. Zevely indicated during that conversation that Nickel could not remain at Stephens. Laurie believed that Zevely's answer did not leave any other options. Laurie never inquired whether Nickel could take a leave and later return to Stephens. Nickel's parents had paid all tuition for the 2011-2012 academic school year before classes started. Laurie was told that Nickel's tuition would be refunded for the Spring 2012 semester. Also during her call with Zevely, Laurie asked whether she and her sister, Carol Spratt, could have until the weekend to gather Nickel's belongings, including Hippo. Zevely told Laurie that she would contact Campus Security so that Laurie could be admitted to

4

Nickel's residence hall room for this purpose. Zevely did not think it was appropriate to attempt to contact Nickel directly, nor did she believe she would be able to speak to her based on previous experiences she had with individuals receiving inpatient treatment in a hospital psychiatric unit.

Following this conversation with Laurie, Zevely informed Duren and other Stephens administrators that Nickel was taking a medical withdrawal and prepared a form indicating the withdrawal. Stephens processed Nickel's leave as a medical withdrawal.[4] Stephens's withdrawal policy allows for withdrawal by students, or "at the request of [Stephens]."

At the time when the decision was made to have Nickel take a medical withdrawal, no one from Stephens had reviewed any of Nickel's medical records or consulted with any of her health care providers, counselors, or Stephens's Staff Psychologist. The only information Stephens had was that "there had been an overdose and that [Nickel] had been dealt with medically and then was getting some psychiatric help."[5] At the time, Stephens did not have a specific "medical withdrawal" policy and there was no appeal process for that decision.

On or about January 15, 2012, Laurie and Spratt came to Stephens's campus and were given access to Nickel's dorm room to collect Nickel's belongings, including Hippo.

---

[4] Nickel asked representatives whether she was being placed on medical withdrawal and she was told no. The evidence in the record consistently shows that Nickel was not expelled but issued a withdrawal for medical reasons. Expulsion from Stephens would have resulted in an indication of such on Nickel's transcript and the inability to reapply for admission. No such indication was made on her transcripts and Nickel was told she could reapply for admission to Stephens.

[5] Although Nickel omitted Duren's deposition from the record on appeal, Nickel's Response to Stephens's Motion for Summary Judgment alleges that Duren testified to the facts in this paragraph in his deposition.

5

At this time, Nickel was still an inpatient at University Hospital, where she was first stabilized and then moved to the psychiatric unit.

Nickel was released from the Psychiatric Unit at University Hospital on or about January 18, 2012. Soon after, Coleman received a text message from Nickel inquiring about her status at Stephens. Following Nickel's text message, Duren, Zevely, and Coleman spoke with Nickel on the telephone. During this conversation, Nickel asked about her status with Stephens, and was told she had been withdrawn and was no longer a student. Nickel was also told that she could reapply for admission.

Nickel was informed by Stephens officials that she was not allowed upon the property of Stephens without a security escort or she would be subject to arrest and criminal prosecution for trespass. Nickel later contacted Campus Security and was allowed on campus to collect her books and request transcripts.

The Student Conduct Code ("SCC") is an annual publication of Stephens that applies to all undergraduate students and provides rules, regulations, policies, and procedures regarding student misconduct. The SCC states that it "is not a contract" and that "Stephens reserves the right to amend any provision at any time."

If a student is determined to have violated the SCC, pursuant to the disciplinary procedures, Stephens may impose various sanctions, up to and including expulsion. Under the SCC, an expulsion will be recorded on the student's transcript. Nickel was never told that she violated the SCC, her transcript does not note that she was expelled or subjected to any disciplinary action.

6

Nickel filed suit in the circuit court of Boone County raising seven counts: Breach of Contract (Count I); Tortious Interference with a Contract (solely against the individual respondents - Count II); Negligent Infliction of Emotional Distress (Count III); Prima Facie Tort (Count IV); Negligent Supervision and Training (solely against Stephens - Count V); Negligence Per Se (solely against Stephens - Count VI); and Negligence (Count VII). The petition requested actual and punitive damages. Following discovery, the trial court granted the Respondents' Motion for Summary Judgment on all counts. Nickel now appeals.

## Briefing Deficiencies

At the forefront, we must note several deficiencies in Nickel's briefing. For example, Nickel's first and second points on appeal are impermissibly multifarious because they raise multiple, discrete complaints that are required by Rule 84.04(d)(1)(A) to be asserted in separate points on appeal. *See Host v. BNSF Ry. Co.*, 460 S.W.3d 87, 96 n.4 (Mo. App. W.D. 2015). Multifarious points on appeal preserve nothing for appellate review. *Id.* Here, Nickel's first point combines her breach of contract claim and her tortious interference with contract claim. Likewise, Nickel's second point combines her negligent infliction of emotional distress claim with her prima facie tort, negligent supervision and training, and her negligence claims. However, each of these claims is separate and distinct and requires proof of distinct elements and for this reason the claims of error should have been raised in separate points.

Another very significant deficiency in Nickel's briefing is that she does not cite to the record to support her factual statements in the argument sections. Rule 84.04(e)

7

requires that "[a]ll factual assertions in the argument shall have specific page references to the relevant portion of the record on appeal, i.e., legal file, transcript, or exhibits." An argument that violates Rule 84.04 wholly fails to preserve any error for review. *Brown v. Ameristar Casino Kansas City, Inc.*, 211 S.W.3d 145, 147 (Mo. App. W.D. 2007).

> Compliance with Rule 84.04 briefing requirements is mandatory in order to ensure that appellate courts do not become advocates by speculating on facts and on arguments that have not been made. Deficient points relied on force the appellate court to search the argument portion of the brief or the record itself to determine and clarify the appellant's assertions, thereby wasting judicial resources, and, worse yet, creating the danger that the appellate court will interpret the appellant's contention differently than the appellant intended or his opponent understood.

*Treaster v. Betts*, 297 S.W.3d 94, 95 (Mo. App. W.D. 2009) (internal citations omitted).

As we have noted:

> Whether to dismiss an appeal for briefing deficiencies is discretionary. That discretion is generally not exercised unless the deficiency impedes disposition on the merits. It is always our preference to resolve an appeal on the merits of the case rather than to dismiss an appeal for deficiencies in the brief. But where the deficiencies in briefing are so substantial that the court is forced to speculate on claims raised and facts and arguments to support those claims, then no meaningful review can be conducted. This would impermissibly place upon this court the role of advocate for a party.

*Lanham v. Div. of Emp't Sec.*, 340 S.W.3d 324, 327 (Mo. App. W.D. 2011) (citations and quotations omitted).

We will occasionally review non-compliant briefs *ex gratia*. *Adams v. Div. of Emp't Sec.*, 459 S.W.3d 918, 921 (Mo. App. W.D. 2015). "We do so, however, only 'where the argument is readily understandable.'" *Id.* In this matter, we exercise our discretion to address the merits of the appeal insofar as the arguments being advanced can be discerned.

8

## Standard of Review

When considering an appeal from summary judgment, we review the trial court's grant of summary judgment *de novo*. *Reimer v. Hayes*, 365 S.W.3d 280, 282 (Mo. App. W.D. 2012) (citing *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993)). We affirm the trial court's grant of summary judgment if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Id.* We will affirm summary judgment on any grounds supported by the record, whether or not relied upon by the trial court. *Id.*

## Point I

In her first point, Nickel contends that the trial court erred in sustaining Stephens's Motion for Summary Judgment with respect to her breach of contract and tortious interference with contract claims. She argues that the relationship between her and Stephens was contractual in nature, that Stephens breached the contract, and that the individual Respondents tortiously interfered with that contractual relationship.

## Breach of Contract Claim

In order to make a submissible case for breach of contract, the complaining party must establish the existence of a valid contract, the rights of plaintiff and obligations of defendant under the contract, a breach by defendant, and damages resulting from the breach. *Lucero v. Curators of Univ. of Mo.*, 400 S.W.3d 1, 5 (Mo. App. W.D. 2013) (citation omitted). Additionally, in order to assert a breach of contract claim against a university, a student plaintiff must "point to an identifiable contractual promise that the [university] failed to honor." *Id*. (citations omitted).

9

Nickel concedes that there is no explicit contract between Nickel and Stephens. However, Nickel cites a number of cases from other jurisdictions that have found that an implied contractual relationship forms between a university and its students. *See e.g., Slaughter v. Brigham Young Univ.*, 514 F.2d 622, 625 (10th Cir. 1975); *Merrow v. Goldberg*, 672 F.Supp. 766, 774 (D.Vt. 1987). The parties and the Court have not found a case in Missouri that has held that an implied contract for educational services arises between a student and University.[6] It is unnecessary to decide whether such an implied contract could exist, however, as Nickel cannot identify any "contractual" promise that Stephens has failed to honor.

A very similar issue and approach was followed by this Court in *Lucero*. In *Lucero*, a former law school student at the University of Missouri-Columbia brought a

_____

[6] Although unclear from the briefing, the record shows that Nickel is not arguing for the equitable remedy of implied contract, where she would be seeking damages to prevent unjust enrichment, but rather an implied-in-fact contract. "A true contract is said to be express or implied in fact, and differs from a quasi-contract which it is said is no 'contract at all' but which is commonly called a contract implied in law. There is no difference in legal effect between an express contract and one implied in fact. The distinction lies merely in the manner of manifesting mutual assent." *Bailey v. Interstate Airmotive, Inc.*, 219 S.W.2d 333, 338 (Mo. 1949). "When determining whether an implied contract exists, the court will consider the parties' acts, conduct, and statements as a whole; whether there was a meeting of the minds on the agreement's essential elements; the parties' intent to enter into a contract upon defined terms; and whether one of the parties has relied in good faith upon the alleged contract." 17A AM. JUR. 2d Contracts § 14 (2015). Nickel's position is inconsistent as she argues that the contract was implied in fact, i.e. not express or written. Then she argues, however, that the SCC provides the terms of the implied contract. We will assume for the present that her position is that even though the contract is implied, the terms of the SCC were incorporated into that agreement. The terms of the SCC, however, expressly state that it is not a contract. This would suggest that, at least with regard to the SCC, Stephens did not agree to entering into a contract on those terms. In addition, Stephens reserved the right in the SCC to alter the terms of the SCC unilaterally. The ability to unilaterally alter the terms of a contract makes the contract unenforceable. *See Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 776-77 (Mo. banc 2014); *see also Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 662-63 (Mo. banc 1988) (an employee handbook which was unilaterally prepared by an employer, and subject to change by the employer at any time, did not establish enforceable contractual rights); *Jennings v. SSM Health Care St. Louis*, 355 S.W.3d 526, 533-34 (Mo. App. E.D. 2011) (same). Although we do not foreclose the potential for a contractual relationship to develop between a university and a student, Missouri law requires that for an implied in fact contract to exist, there must be a meeting of the minds on essential terms. We cannot find that such a meeting of the minds occurred here at least with respect to any restriction on Stephens's ability to involuntarily withdraw a student for medical reasons in the circumstances of this case. We do not believe this conflicts with cases by some courts that have held open the opportunity for a contract to form between a university and student where the student can identify a specific contractual promise for services that was broken and a meeting of the minds can be demonstrated. *See Robbe v. Webster*, No. 4:14CV1223HEA, 2015 WL 1412014 (E.D. Mo. Mar. 25, 2015)

10

damages action against the university curators for breach of contract arising out of a dispute between the student and a law professor. 400 S.W.3d at 3-4. The student alleged that the university's rules and regulations formed the basis of contractual liability. *Id*. at 5. This Court noted that, unlike some jurisdictions, we were unaware of any case in Missouri that had expressly found the existence of a contractual relationship between a student and a university solely based on the student's enrollment at a university. *Id*. at 4-5. Rather than decide whether such a contract could exist, however, *Lucero* found that, irrespective of the answer to that question, the plaintiff failed to establish what rights or obligations under the alleged contract that the university breached. *Id*. at 5, 8. The rules and regulations cited in *Lucero* were either aspirational in nature and non-enforceable as contractual promises or, by their own terms, could not form the basis of a breach of contract claim. *Id*. at 6-8.

Nickel identifies the General Procedures Regarding Disciplinary Action in the SCC as the basis of the breached contract. The purpose of the SCC is to provide students with general notice of prohibited conduct and disciplinary procedures. The SCC contains sanctions for misconduct, such as academic dishonesty, harassment, physical assault, hazing, etc. If a student is suspected of having violated the terms of the SCC, the SCC sets out procedures to be followed by the university and possible sanctions if a violation of the SCC is established.

Nickel argues that her involuntarily withdrawal was, in effect, an expulsion and, thus, the procedures in the SCC that provide students the right to a hearing, etc. before an expulsion can be implemented should have been followed in her case. The only

11

argument Nickel presents that the SCC should have governed the conduct and process at issue in this case is the "fact" of her expulsion. "Expulsion," defined by the SCC, is the "permanent separation of the student from the College. The sanction will be recorded on the student's transcript. The Student will also be barred from College property. Only the President of the College may recommend readmission of a student who has been expelled."

It is uncontroverted that no complaint or action under the SCC was ever filed with Stephens. It is uncontroverted that Nickel was never told she had violated the SCC. It is uncontroverted that no record of expulsion appears on Nickel's transcripts. This is also supported by Nickel's own statement that she was told she could reapply for Spring semester admission. The only evidence submitted by Nickel to dispute Stephens' averment that she was not expelled is deposition testimony, by Nickel, that states she was told she could not physically return to campus without a security escort. This is insufficient to create a dispute as to a genuine issue of material fact to contest Stephens' assertion that Nickel was not expelled.

> For purposes of Rule 74.04, a "genuine issue" exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts. A "genuine issue" is a dispute that is real, not merely argumentative, imaginary or frivolous. Where the "genuine issues" raised by the non-movant are merely argumentative, imaginary or frivolous, summary judgment is proper.

*ITT Commercial Fin. Corp.,* 854 S.W.2d at 382. The fact that the university told Nickel, whose actions had demonstrated a risk of erratic behavior, that she could not physically return to campus without an escort does not provide a refutation of Stephens's assertion

12

that she was not expelled but rather issued an involuntary medical withdrawal. After the withdrawal, Nickel was no longer a student. Stephens, as a private university, could of course determine that it was imprudent to allow her on campus so soon after an incident of self-harm. Under the definition of expulsion contained within the document that Nickel claims gave her identifiable rights and to Stephens identifiable obligations under the alleged implied contract, Nickel was not expelled. Because Nickel was not expelled but issued a medical withdrawal, the purported rights and obligations afforded to her by the SCC were inapplicable.

In fact, the only written provision identified by the parties applicable to a withdrawal supports the ability of Stephens, on its own initiative, to involuntarily withdraw a student without that student's consent. Stephens's withdrawal policy is not a part of the SCC but is contained in a separate document pertaining to the university's Refund/Withdrawal Policy. The withdrawal policy states, "[w]ithdrawal may be voluntary or at the request of the college." This allows for both voluntary withdrawals by students and involuntary withdrawals "at the request of [Stephens]." Accordingly, Nickel has not identified a specific promise or obligation that Stephens breached to form the basis of her breach of contract claim. The trial court, therefore, did not err in granting Stephens's motion for summary judgment with respect to Nickel's breach of contract claim.

### Tortious Interference with Contract Claim

Nickel's first point also includes a claim error in the grant of summary judgment regarding the petition's claim of tortious interference with the contractual relationship

13

between Nickel and Stephens by the individually named Respondents. To prove a claim of tortious interference with a contract or business expectancy, Nickel must demonstrate: (1) a contract or valid business expectancy; (2) the defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages. *Farrow v. Saint Francis Med. Ctr.*, 407 S.W.3d 579, 602 (Mo. banc 2013). However, an action for tortious interference with a business expectancy will lie only against a third party to the contract. *Id.* Where the individual being sued is an officer or agent of the defendant corporation, the officer or agent acting for the corporation is the corporation for purposes of tortious interference. *Id.; see also Fields v. R.S.C.D.B., Inc.*, 865 S.W.2d 877, 879 (Mo. App. E.D. 1993) (Plaintiff's claim of tortious interference is without merit because "[t]he individual defendants were alleged to have acted as officers and agents of the corporate defendants. Corporations can only act through their agents. An officer or agent acting for the corporation is the corporation for purposes of the tort alleged here.")

Nickel alleges that the contractual relationship at issue is between herself and Stephens. It is uncontroverted that, at all times, Respondents Duren, Zevely, and Coleman "were acting within the course and scope of their employment" with Stephens. Accordingly, the individual Respondents were not third-parties to the alleged contract. Therefore, Nickel's claim against the individual Respondents for tortious interference must fail. The trial court did not err in granting summary judgment in favor of Stephens with respect to her tortious interference claim.

Point I is denied.

14

**Point II**

In her second point, Nickel argues that the trial court erred in granting summary judgment in favor of Stephens on her claims of negligence, negligent infliction of emotional distress, negligent training and supervision, and prima facie tort because Stephens "owed a duty to [Nickel] to not expel her simply because of the manifestation of mental health issues." Nickel has impermissibly grouped all these allegations of error together in violation of this Court's briefing rules, but we will gratuitously address each claim in turn.

**Negligence and Negligent Infliction of Emotional Distress Claims**

A negligence claim requires proof of: (1) a legal duty of the defendant to protect the plaintiff from injury, (2) breach of the duty, (3) proximate cause, and (4) injury to the plaintiff. *Thornburg v. Fed. Express Corp.*, 62 S.W.3d 421, 427 (Mo. App. W.D. 2001).

> Claims seeking recovery of damages for the negligent infliction of emotional distress require proof of two additional elements: 1) that the defendant should have realized that his conduct involved an unreasonable risk of causing distress, and 2) that the emotional distress or mental injury must be medically diagnosable and must be of sufficient severity so as to be medically significant.

*Id*.

The issue of whether a duty exists for purposes of negligence claims is a question of law for the court to determine. *Lopez v. Three Rivers Elec. Coop.*, 26 S.W.3d 151, 155 (Mo. banc 2000).

> The judicial determination of the existence of a duty rests on sound public policy as derived from a calculus of factors: among them, the social consensus that the interest is worthy of protection; the foreseeability of harm and the degree of certainty that the protected person suffered injury; moral blame society attaches to

15

the conduct; the prevention of future harm; consideration of cost and ability to spread the risk of loss; the economic burden upon the actor and the community and others.

*Dallas Airmotive, Inc. v. FlightSafety Int'l, Inc.*, 277 S.W.3d 696, 699 (Mo. App. W.D. 2008) (citation omitted).

Nickel argues that the duty owed to her by Stephens that supports her claims of negligence arises out of the "special relationship between a student and his or her college" and "imposes upon both parties certain duties and obligations" including "that the college not arbitrarily and capriciously expel the student."[7]  Rather than support her claim of the existence of this amorphous general legal duty between a college and each of its students, Nickel relies only on the court's standard of review, arguing the cases cited by Respondents in opposition to this view are inapplicable to these facts.  In the present case, the standard of review requires us to view the factual record in a light most favorable to Nickel; however, it does not require us to assume that the law supports her factual contention.  Nickel has not cited authority from Missouri or any other jurisdiction holding that a specific duty of care exists with regard to how a college or university addresses a student's enrollment, handles an attempted suicide or other serious mental health issue of a student, processes a medical withdrawal, or any other similarly applicable duty.

This Court has consistently rejected the contention that simply enrolling in a university creates a legal duty of care to support a negligence claim that involves the

---

[7] Even though Nickel repeatedly asserts she was expelled from Stephens, the evidence in the record indicates that she given an involuntary medical withdrawal for the semester.

16

university's instruction of that student. In *Dallas Airmotive*, *Inc.*, we rejected what have been called "educational malpractice claims," which generally arise when a student challenges allegedly deficient instructional methods. *Id.* at 699. We have found that those claims are not cognizable because there is no duty. *Id.* Part of the reason for this decision is that courts "have refused to become the 'overseers of both the day-to-day operation of [the] educational process as well as the formulation of its governing policies.'" *Id.* at 700 (quoting *Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468, 472 (Minn. Ct. App. 2008)). This is in accord with the general principle that no special relationship exists between a college and its students even when it comes to matters of safety. *See Freeman v. Busch*, 349 F.3d 582, 588 (8th Cir. 2003) (finding no special relationship); *Booker v. Lehigh Univ*., 800 F.Supp. 234, 237–41 (E.D. Pa. 1992); *Nero v. Kan. St. Univ*., 861 P.2d 768, 778 (Kan. 1993) (same); *Univ. of Denver v. Whitlock*, 744 P.2d 54, 59–61 (Colo. 1987) (same); *Eiseman v. State*, 511 N.E.2d 1128, 1136–37 (N.Y. App. 1987) (same); *Beach v. Univ. of Utah*, 726 P.2d 413, 415–16 (Utah 1986) (same).[8]

In the case at bar, Nickel claims that Stephens's decision to issue her a medical withdrawal due to her mental health issues and hospitalization breached a duty that exists simply by virtue of the university-student relationship. We have refused to recognize a

---

[8] Missouri recognizes a narrow exception to this general rule in the school-student context where there is a special relationship, insofar as the school has a duty to prevent the unreasonable risk of harm to students through the conduct of third parties. In other contexts this duty arises between an innkeeper-guest, common carrier-passenger, and sometimes employer-employee relationships. *See e.g., Advance Rental Ctrs., Inc. v. Brown*, 729 S.W.2d 644, 646 (Mo. App. S.D. 1987); *Keenan v. Miriam Found.*, 784 S.W.2d 298, 301-02 (Mo. App. E.D. 1990). This narrow exception for safety concerns arises in circumstances in which one party entrusts another for protection and relies upon that party to provide a place of physical safety. *See Claybon v. Midwest Petroleum Co*., 819 S.W.2d 742, 744-745 (Mo. App. E.D. 1991). This very narrow exception helps to prove the general rule that no generic special relationship exists between a university and its students. In addition, other general duties remain independent of the university-student relationship, such as the duty by an instructor to use reasonable care not to cause physical injury during the course of instruction. *Dallas Airmotive, Inc.,* 277 S.W.3d at 700-701 (citing *Doe v. Yale Univ*., 748 A.2d 834, 846–50 (Conn. 2000)).

duty to support a cause of action for negligence after educational services have been rendered and Nickel has failed to cite authority which would support recognizing a duty in connection with administrative decisions related to a student's enrollment status. For these reasons, the trial court did not err in granting summary judgment in favor of Stephens with respect to both Nickel's negligence and negligent infliction of emotional distress claims.

## Negligent Supervision and Prima Facie Tort Claims

Nickel's two remaining claims under Point II, Stephens's alleged negligent supervision and training of its employees and prima facie tort, rely on the same contention as her aforementioned negligence claims: that Respondents owed a duty to her regarding her enrollment status at the university by virtue of the university-student relationship. It is unclear to us what this alleged duty has to do with a negligent supervision claim, *see Dibrill v. Normandy Assocs., Inc.*, 383 S.W.3d 77, 87 (Mo. App. E.D. 2012), or a *prima facie* tort claim, *see Thomas v. Special Olympics Mo., Inc.*, 31 S.W.3d 442, 449 (Mo. App. W.D. 2000). Regardless, Nickel's point on appeal alleges it was error to dismiss her tort claims as Stephens owed her a duty that we have found does not exist, which is dispositive.[9]

_____

[9] Nickel argues that the SCC promulgated by Stephens is relevant to her tort claims. However, the SCC, pertains to disciplinary procedures for wrongdoing by a student and the procedure for disciplining a student for violating Stephens's policies. Nickel attempts to bootstrap the application of the SCC into the case at bar by arguing that the effect of the medical withdrawal in this case was analogous to an expulsion from campus for a disciplinary matter. However, had Nickel been expelled she would have been prohibited from applying to return to the school and her permanent record would have reflected the disciplinary action taken against her. Accordingly, the SCC would be inapplicable. Regardless, the question of existence of a common law duty to support a negligence claim is a legal determination. *See Dallas Airmotive, Inc*., 277 S.W.3d at 699.

18

In addition, a negligent supervision claim requires as a necessary and indispensable element that that the employee be acting outside of the scope of her employment. *See Truck Ins. Exch. v. Prairie Farming, LLC*, 162 S.W.3d 64, 82 (Mo. App. W.D. 2005) ("negligent supervision by a master requires a showing that the servant was acting 'outside the course and scope of his employment'"); *Reed v. Kelly*, 37 S.W.3d 274, 277 (Mo. App. E.D. 2000) (citing RESTATEMENT (SECOND) OF TORTS § 317 (1965)) (defining a negligent supervision cause of action and noting, "this cause of action also requires evidence that would cause the employer to foresee that the employee would create an unreasonable risk of harm *outside the scope of his employment*" (emphasis added)). As has already been established, it is uncontroverted that Respondents were at all times acting with the course and scope of their employment. Accordingly, the negligent supervision claim must fail.

In addition to this Court finding no duty, which was Nickel's claim of error regarding her prima facie tort claim, such a claim requires, *inter alia*, a showing of defendant's "intent to injure the plaintiff." *LPP Mortg., Ltd. v. Marcin, Inc.*, 224 S.W.3d 50, 53-54 (Mo. App. W.D. 2007). "Spite or ill-will is necessary to satisfy the requisite intent" and the burden on the plaintiff to submit evidence on this element is a heavy one. *Woolsey v. Bank of Versailles*, 951 S.W.2d 662, 669 n.6 (Mo. App. W.D. 1997) (citing *J.S. DeWeese Co. v. Hughes–Treitler Mfg. Corp.*, 881 S.W.2d 638, 646 (Mo. App. E.D. 1994)). It is uncontroverted that the Respondents were concerned about Nickel's health and well-being and they believed they were acting in her best interests. Nickel provided

19

no evidence in her opposition to summary judgment to refute Stephens' contention.[10] This material fact, established in the record through competent evidence by Stephens, is sufficient to entitle Stephens to summary judgment on Nickel's prima facie tort claim, in addition to the additional reasons stated above.

Point II is denied.

## Point III

In Nickel's final point on appeal, she contends that the trial court erred in granting summary judgment in favor of Stephens with respect to her negligence *per se* claim because Stephens "violated Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. §12101), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §701), and/or the Individuals with Disabilities Education Act (20 U.S.C. §1431)."

The Court declines to review Nickel's third point on appeal. Nickel fails to comply with Rule 84.04(d), as her point is merely an abstract statement that three federal statutes have been violated. Abstract statements of the law, standing alone, do not comply with this rule. *Landwehr v. Landwehr*, 129 S.W.3d 395, 398 (Mo. App. W.D. 2004). In addition, Nickel has not even attempted to explain how the statutes cited have been violated and has not identified any evidence in the legal file in support of her claim, in contravention of Rule 84.04(e). "Where briefing deficiencies are so substantial that, in order to conduct any review, we 'would be forced to speculate not only as to the claims being raised, but as to the facts and arguments being relied on in support of the same, we

---

[10] Nickel objected to the statements regarding Respondents' mental states as being immaterial and submitted a motion to strike. The motion to strike does not appear in the record, but the trial court's docket entry shows the motion to strike was denied. As explained above, Respondents' intent was a material fact with regard to her prima facie tort claim. Accordingly, these averments remain uncontroverted.

have no choice but to decline review.'"  *Id*. (quoting *Lemay v. Hardin*, 108 S.W.3d 705, 709 (Mo. App. W.D. 2003)).  Such is the case here.[11]

Point III is denied.

**Conclusion**

For the reasons described herein, the judgment of the trial court is affirmed.

_____
Gary D. Witt, Judge

All concur

---

[11] We note gratuitously, however, that Nickel has not identified any express language in these statutes that suggest they were intended to set a standard of care for negligence actions.  To the contrary, both the ADA and Section 504 explicitly provide private rights of action where intentional discrimination can be demonstrated.  *See Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011).  "When the Legislature has established other means of enforcement, we will not recognize a private civil action unless such appears by clear implication to have been the legislative intent."  *Imperial Premium Fin., Inc. v. Northland Ins*. Co., 861 S.W.2d 596, 599 (Mo. App. W.D. 1993) (quoting *Shqeir v. Equifax, Inc*., 636 S.W.2d 944, 948 (Mo. banc 1982)).  There is simply nothing in the statutes cited by Nickel that suggests it was the legislature's intent to make the violation of these statutes actionable in negligence.  In addition, it appears that the purpose of the Individuals with Disabilities Education Act ("IDEA") is to ensure that all children with disabilities have available to them a free appropriate public education.  The IDEA provides for remedies when public educational institutions fail to meet the required education standards.  *Forest Grove Sch. Dist. v. T.A*., 557 U.S. 230 (2009).  As such, it would appear on its face that the IDEA is not applicable here, as Stephens is not a public but a private institution of higher education and Nickel is an adult.